UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CRIM. NO. 21-00189 (CJN)

UNITED STATES OF AMERICA,
        Plaintiff,

v.

RICHARD L. HARRIS,
        Defendant.
_____/

## DEFENDANT'S MOTION FOR BOND REVIEW

The Defendant, Richard Harris, though undersigned counsel, and pursuant to 18 U.S.C. §3145(b), moves this Court to review – and revoke – the order of a magistrate judge from the Southern District of Florida detaining him pending resolution of the charges here,[1] and states that:

The instant Indictment charges Mr. Harris with five offenses – two felonies[2] and three misdemeanors[3] - related to his alleged involvement in the events at the United States Capitol on January 6th of this year.  (DE 1).  After conducting a hearing,[4] a magistrate judge ordered that he be detained pending trial, finding that

---

[1] *See* Exhibit A.

[2] Assaulting, Resisting or Impeding Certain Officers in violation of 18 U.S.C. §111(a)(1) (Count One); and Obstruction of an Official Proceeding in violation of 18 U.S.C. §1512(a)(2) (Count Two).

[3] Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. §1752(a)(1) (Count Three); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. §1752(a)(2) (Count Four); and Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. §5104(e)(2)(D) (Count Five).

[4] A transcript of that hearing is attached as Exhibit B.

1

he is both a danger to the community and a risk of flight. Exh. A. But the evidence elicited at that hearing reflects that he is neither. While Mr. Harris was concededly present at the Capitol on January 6th, his actions that day fail to establish that he "poses a concrete, prospective threat to public safety." *United States v. Munchel*, 991 F.3d 1273, 1290 (D.C. Cir. 2021). Additionally, despite his seeming transience during the weeks following January 6th, he can now return to his father's home in Happy Valley, Oregon until the completion of these proceedings. This Court can thus fashion conditions of release that can "reasonably assure": 1) his appearance when required; and 2) "the safety of any other person and the community[.]" 18 U.S.C. § 3142(g).

*Mr. Harris's Actions on January 6th*

At the hearing before the magistrate judge, the government relied primarily on three exhibits depicting Mr. Harris inside the Capitol on January 6th. The first was a still picture distilled from a short video-recording, which shows Mr. Harris addressing a law enforcement officer while other civilians stand nearby. The government proffered at the hearing that in the audio portion of the recording, Mr. Harris tells the officer that, "You're outnumbered. There's a F'ing million of us out there. We're listening to Trump, your boss." Exh. B at p. 6. The officer then steps back, allowing the civilians access to an interior stairway.

The second exhibit was similarly derived from a brief video-recording. In it, Mr. Harris is holding a telephone. The prosecutor proffered that the audio reflects Mr. Harris asking for Speaker Pelosi and then saying, "We're coming for you, you [ ] bitch." Exh. B at p. 6. He then directs a similar comment towards Vice President

Pence, calling him a "F'ing traitor." *Id*. The FBI agent who testified at the hearing conceded that neither the Speaker nor the Vice President were on the line when those remarks were made. *Id*. at p. 14.

The third exhibit introduced at the hearing was a photograph of Mr. Harris with his arm draped around a statue of President Ford. A hat is on the statue's head and a "Trump" banner is tucked under its arm.

The evidence presented at the hearing before the magistrate judge was perhaps more notable for what it lacked than for what it contained. Nowhere in its proffer or in the testimony of its agent did the government establish that Mr. Harris: 1) met beforehand with others to organize the protests; 2) helped storm the Capitol's barricades; 3) had physical contact with – much less harm – another person, whether law enforcement or civilian; 4) vandalized property (except for his sophomoric attempt to adorn President Ford's statue); 5) entered either Chamber of Congress; 6) possessed a weapon of any type; or 7) belonged to an organization advocating violence to reverse the results of the 2020 presidential election.

### *Investigation Resulting in Mr. Harris's Arrest*

After January 6th, the government disseminated "Be-On-The-Lookout" posters seeking information concerning Mr. Harris's identity. Exh. B at p. 7. It was then able to trace his travels through eight states beginning on approximately February

21, 2021, and culminating with his arrest in Dania Beach, Florida on March 18, 2021.[5] *Id*. at 8.

A warrant for Mr. Harris's arrest was issued by a magistrate judge in this District on March 5, 2021. Ten days later, an FBI agent called one of Mr. Harris's phones[6] in an "attempt[ ] to get him to turn himself in." Exh. B at p. 8. Although not explicitly stated in the transcript of the detention hearing, the agent and Mr. Harris did not in fact speak. The government introduced no evidence that prior to the agent's call, Mr. Harris knew that he was a target of the government's investigation.[7] Nor did it show that Mr. Harris actually listened to the agent's message. Whether he did or not, he was arrested without incident only three days after the call.

*Danger to the Community*

Before receiving the government's proffer at the detention hearing, the magistrate judge asked whether 18 U.S.C. § 111 (a)(1) – the offense charged in Count One here – is a "crime of violence" pursuant to 18 U.S.C. § 3142(f)(1)(A). Exh. B at p. 4. To his credit, the prosecutor responded that it is not as Mr. Harris had not possessed a weapon on January 6th. *Id*. at p. 5. The prosecutor then agreed with

---

[5] Dania Beach is located on Florida's east coast between Fort Lauderdale and Miami.

[6] He had three when arrested. Exh. B at p. 8.

[7] The government may contend that Mr. Harris must have known of the extent of that investigation from the pervasive media coverage of January 6th. But, as the government will likely acknowledge, Mr. Harris was residing in his car for much of that period. He therefore may not have had access to that coverage.

the magistrate judge's observation that the government was thus obligated to "convince" the court that Mr. Harris was either a "serious risk of flight" or a "serious risk" of obstructing justice or intimidating witnesses to warrant detention. *Id.* He then outlined why, in the government's view, Mr. Harris is a flight risk. Despite the government's concession, the magistrate judge ultimately found that the Defendant is a danger to the community. *Id.* at p. 26. That conclusion cannot be sustained.

Initially, this Court should consider what relevance, if any, Mr. Harris's purported dangerousness has to the issue presently before it. Although not clear, it appears that the magistrate judge cited danger to the community as an independent basis justifying detention. But in *United States v. Ploof*, the First Circuit found that "where detention is based on dangerousness grounds, it can be ordered only in cases involving one of the circumstances set forth in [18 U.S.C.] §3142(f)(1)." 851 F.2d 7, 11 (1st Cir. 1988), *citing United States v. Himler*, 797 F.2d 156 (3d Cir. 1988).[8] As the magistrate judge recognized – and the government confirmed – that detention here is being sought pursuant to only subsection (f)(2) of §3142, the magistrate judge's reliance on dangerousness was arguably[9] flawed.

---

[8] *See* also *United States v. Giordana*, 378 F.Supp. 2d 1256 (S.D. Fla. 2005)("Circuit Court opinions considering this issue under section 3142(f) have all ruled that the 'dangerousness' prong for pretrial detention under section 3142(e) *only* applies to cases that arise under section 3142(f)(1)." *Id.* at 1261 (emphasis in original)).

[9] The Defendant recognizes that this Court rejected a similar argument in *United States v. Michael Thomas Curzio*, Crim. No. 21-041 (CJN). It is being raised here should the Court be inclined to revisit its earlier decision.

The legal argument addressed above is likely academic as, regardless of its outcome, the government has failed to establish factually that Mr. Harris "present[s] an identified and articulable threat to the community." *Munchel*, *supra*, 991 F.3d at 1282. The analysis in *Munchel* compels that conclusion.

*Munchel*, like the instant case, stemmed from the "particular circumstances of January 6." *Id.*, 991 F.3d at 1283. The defendants there were mother and son. Judge Katsas, in his opinion concurring in part and dissenting in part,[10] summarized their conduct as follows:

> [They] did not organize the election protest or the ensuing march to the Capitol, hatched no advance plan to enter the Capitol, and acted in concert with no other protestors. Nor did they assault any police officers or remove any barricades in order to breach Capitol security. They decided to enter the Capitol only after others had already done so forcibly. By the time they made their way to the building, police were making no attempt to stop or even discourage protestors from entering. To go inside, [they] walked through an open door. While there, they attempted neither violence nor vandalism. They searched for no Members of Congress, and they harassed no police officers. They found plastic handcuffs by chance, but never threatened to use them. [The son's] threat to "break" anyone who vandalized the Capitol was intended to prevent destruction and was addressed to no one in particular. [ ] For ten to twelve minutes, [they] wandered the halls of the Capitol, with [the mother] leading the way and [her son] asking his mother what her plan was. At one point, they entered the Senate gallery. At another, as they entered what appears to be a hallway of offices, [the son] told his mother that "[w]e don't want to get stuck in here, this is not a place for us," which caused her to turn around. [ ] [They] voluntarily left the building – while many other

---

[10] Rather than joining the majority's decision to remand the detention orders to the district court for reconsideration, Judge Katsas would have "reverse[d] outright". *Munchel*, 991 F.3d at 1285 (Katsas, J., concurring in part and dissenting in part).

6

> protestors remained and before the police began to restore order. Their misconduct was serious, but it hardly threatened to topple the Republic. Nor, for that matter, did it reveal an unmitigable propensity for future violence. *Id*. at 1286-7.

Although maybe not identically situated to the defendants in *Munchel*, Mr. Harris is surely similarly situated to them. Like them, be had no role in planning the demonstrations on January 6th. Although Count One of the Indictment here alleges that he "forcibly assault[ed], resist[ed], oppose[d], impede[d], intimidate[d], and interfere[d] with" a law enforcement officer that day, his words were more akin to "rhetorical bravado", *Munchel*, 991 F.3d at 1287 (Katsas, J., concurring in part and dissenting in part), than a realistic threat to cause bodily injury with an apparent and immediate ability to do so.[11] He entered the Capitol "only after others had done so forcibly." *Id*. at p. 1286. While inside, he "attempted neither violence nor vandalism." *Id*. Although he pretended to speak with Speaker Pelosi and Vice President Pence, he sought out neither. Despite the magistrate judge's findings to the contrary, Exh. B at p. 24, he did not exhort others to engage in illicit activity.[12] Just as he entered the Capitol voluntarily, he left the same way. In fact, the sole

---

[11] *See United States v. Fallen*, 256 F.3d 1082 (11th Cir. 2001) (defining "forcible assault" as "a willful attempt or threat to inflict *serious* bodily injury, coupled with an apparent present ability, which causes the intended victim a reasonable apprehension of immediate *serious* bodily harm *or death*." *Id*. at 1088 (emphasis in original).

[12] Similarly, the magistrate judge's suggestion that Mr. Harris "was at the head of an angry group of people going into the Capitol", Exh. B at p. 25, has no support in the record.

meaningful factor distinguishing Mr. Harris from the defendants in *Munchel* is that Munchel (the son) possessed a Taser and zip ties inside the Capitol while Mr. Harris remained unarmed at all times.[13]  Munchel is therefore seemingly a greater risk of danger to the community than this Defendant.[14]

The magistrate judge remarked at the detention hearing that this is "not a normal case for detention because it's not a crime of violence and there is no weapon involved." Exh. B at p. 23.  His decision to detain Mr. Harris was therefore apparently based on what he considered to be the Defendant's "disregard for the institution of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether [D]efendant will comply with conditions of release." *Id*. at p. 25.  But any perceived "threat must also be considered in context." *Munchel*, 991 F.3d at 1283.

The Court in *Munchel* made two observations particularly apposite to Mr. Harris's request for release.  First, it noted that "those who actually assaulted police officers and broke through windows, doors and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of

---

[13] Pursuant to the execution of a search warrant at Munchel's home, firearms and loaded magazines were seized. *Id*. at p. 1277.  No weapons were recovered at Mr. Harris's arrest.

[14] At the detention hearing, reference was made to an incident in Oregon during which Mr. Harris allegedly "shov[ed] a photographer". Exh. B at p. 15.  The FBI agent who testified at the hearing admitted that he did not know whether Mr. Harris was acting in self-defense. *Id*. at p. 16.  Because: 1) the record does not reveal the context in which the contact occurred; 2) the photographer apparently was not injured; and 3) the Defendant has not been charged there, that episode merits little, if any, weight in considering whether Mr. Harris is a danger.

dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Id*. at p. 1284. As addressed above, Mr. Harris surely falls within the latter category. The Court then recognized the "unique opportunity" presented by the "electoral college vote tally" occurring at the Capitol on January 6th:

> Because [the defendants there] did not vandalize any property or commit violence, the presence of the group was critical to their ability to obstruct the vote and cause danger to the community. Without it, [the defendants] – two individuals who did not engage in any violence and who were not involved in planning or coordinating the activities – seemingly would have posed little threat. The District Court found that appellants were a danger to "act against Congress" in the future, but there was no explanation of how the appellants would be capable of doing so now that the specific circumstances of January 6 have passed. *Id*.[15]

Absent those "unique" circumstances, there is little or no reason to conclude that Mr. Harris, a forty year old gentleman who does not own a weapon and whose only prior conviction was ultimately set aside, poses the type of future threat that places him within the "subset of defendants charged with crimes that are 'the most serious' compared to other federal offenses." *United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999), citing *United States v. Salerno*, 481 U.S. 739, 747 (1987). Detention based on dangerousness is thus unwarranted.

---

[15] *See also Munchel*, 991 F.3d at 1285 (Katsas, J., concurring in part and dissenting in part) ("The answer to th[e] question [of detention] does not turn on any generalized, backward-looking assessment of the rioters or the riot, as the district court erroneously suggested. Instead, it turns on a specific forward-looking assessment of whether [the defendants] as individuals currently pose an unmitigable threat to public safety.").

*Risk of Flight*

As Mr. Harris is not a danger to another person or to the community, to sustain the magistrate judge's detention order, this Court must find that he poses a "serious risk" that he *will* - not may - flee if released from custody. 18 U.S.C. § 3142(f)(2)(A). Despite his travels during the weeks preceding his arrest, he clearly does not.

Again, context here is important. Prior to March of 2020, Mr. Harris was residing with his father and working for Amazon. But when the pandemic struck, he left Amazon because he feared that he might become infected and in turn infect his father, who is over the age of 65 and significantly overweight. He then continued to stay with his father while obtaining sporadic employment where he would have limited access to the public.

Disheartened by the results of the election and the uprising at the Capitol, Mr. Harris decided to explore alternative locations for him to live with his girlfriend and their newborn twins.[16] After visiting with them in California, he began traveling through the states referenced at the detention hearing, Exh. B at p. 8, until he reached his ultimate destination, Florida, where he stayed for approximately two weeks before he was arrested. But, as the magistrate judge noted, he could not truly be "characterize[d] [ ] as being on the run." *Id*. at p. 23. He did not use false identification to pay for food, gas or lodging (when he did not sleep in his car). The car that he was driving was

---

[16] The children are now seven months old.

registered to him, as was the license plate. He was not concealing his movements as the FBI was able to track him. He did not avoid public areas for fear of detection. To the contrary, he was arrested after leaving a brewery with a friend in one of Florida's most populous areas. And when confronted by law enforcement, he did nothing to resist.

The magistrate judge found "evidence" that suggested that Mr. Harris "would have known that he was wanted for prosecution." Exh. B at p. 23. But, as discussed above, the record does not establish when – or even, if – he heard the voice message left by the FBI agent. If he did, the record certainly does not reflect that he took any evasive actions in the three days between the agent's message and his arrest.

Looking forward, Mr. Harris has depleted all of his savings and therefore lacks the financial resources to flee. But even if he had money, he has no place to go to. He has lived in the United States his entire life. Whatever family he has is here. If he flees, he would of course be unable to communicate with them, leaving him with no home, no family and no prospects. Flight is therefore not a viable option.

As proffered at the detention hearing, Mr. Harris's father, Frederick, has offered his home for his son to stay at pending resolution of the instant charges and as surety for his future appearance when required. The elder Mr. Harris is retired after being employed by Boeing for 38 years. He receives a pension and Social Security benefits. The equity in his house is apparently

11

$300,000. Certainly, the Defendant will not jeopardize all that his father has earned over a lifetime by fleeing, especially as, by the government's estimate, his advisory guideline range would be 15 to 21 months imprisonment. Exh. B at p. 4.

*Conclusion*

As recognized in *Munchel*, courts "have a grave constitutional obligation to ensure that the facts and circumstances of each case warrant th[e] exceptional treatment" of detaining an accused without bond pending trial. *Munchel*, 991 F.3d at 1285. In the instant case, however, the "facts and circumstances" unique to Mr. Harris and his conduct on January 6th do not justify such "exceptional treatment". Like the defendants in *Munchel*, Mr. Harris simply at most "chose to trespass – not to engage in violence, much less fight to the death." *Id*. at 1288 (Katsas, J., concurring in part and dissenting in part). He is thus not a risk of danger. He can now return to his father's home subject to limitations such as a curfew and monitoring if the Court deems those appropriate. He is thus not a risk of flight. As no basis therefore exists to detain him pending the outcome of his case, he asks that the Court revoke the magistrate judge's detention order and order that he be released immediately to the his father's custody.

WHEREFORE, the Defendant requests that the Court approve his immediate release from custody with appropriate conditions.

Respectfully submitted,
MICHAEL CARUSO
Federal Public Defender

| | |
|---|---|
| s/ Eric Cohen | *s/Kristy Militello* |
| Eric Cohen | Kristy Militello |
| Assistant Federal Public Defender | Assistant Federal Public Defender |
| Attorney for Defendant | Attorney for Defendant |
| Florida Bar No. 328065 | Florida Bar No. 0056366 |
| 150 West Flagler Street | 450 South Australian Avenue |
| Suite 1700 | Suite 500 |
| Miami, Florida  33130-1566 | West Palm Beach, Florida  33401 |
| Tel: 305-530-7000 | Tel: 561-833-6288 |
| Email: Eric_Cohen@fd.org | Email: Kristy_Militello@fd.org |

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 7, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day of all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/Eric M. Cohen
Eric Cohen
