Exhibit B

```
 1               IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                   FORT LAUDERDALE DIVISION
                  CASE NO. 21-mj-06163-PMH-1
 3

 4

 5

 6
   United States of America,
 7
                    Plaintiff,              March 26, 2021
 8        vs.
                                        Fort Lauderdale, Florida
 9 Richard L. Harris,

10                  Defendant.          Pages 1 through 33

11

12

13

14

15     TRANSCRIPT OF PRETRIAL DETENTION and REMOVAL HEARING
              BEFORE THE HONORABLE PATRICK M. HUNT
16                UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21 Appearance of Counsel (all by ZOOM)

22 For the Plaintiff:        Joseph Cooley,Esq.
                             Nihar Mohanty, Esq.
23                           United States Attorney's Office

24 For the Defendant:        Daryl Elliott Wilcox, Esq.
                             Federal Public Defender's Office
25
```

Transcribed from Remote Video Teleconference Recording

```
1        (Court was called to order.)

2             COURTROOM DEPUTY:  Your Honor, we're going to proceed

3   in the case of United States of America vs. Richard Harris.

4             Would counsel please announce their appearances for

5   the record, starting with the government.

6             MR. COOLEY:  Good morning.  Joseph Cooley, on behalf

7   of the United States.  I also have AUSA Mohanty from the D.C.

8   circuit here as well.

9             THE COURT:  Okay.  Good morning.

10            MR. MOHANTY:  Morning.

11            THE COURT:  For the defense?

12            MR. WILCOX:  Good morning, your Honor.  Daryl Wilcox,

13  assistant federal public defender, on behalf of the defendant

14  in this case, Richard Harris.  He is present on the Zoom

15  screen, in the Ft. Lauderdale marshal cellblock.

16            THE COURT:  Thank you.

17            Good morning, Mr. Harris.  Can you see me and hear me

18  okay?

19            MR. FRED HARRIS:  Good morning.

20            THE DEFENDANT:  I can, your Honor.  Good morning.

21            THE COURT:  Good morning.  We are here today for a

22  detention hearing.  Are we going forward?

23            MR. MOHANTY:  Yes, your Honor.

24            MR. WILCOX:  Yes, your Honor.

25            THE COURT:  All right.  Mr. Harris, as the other day,
```

```
 1  we're doing this hearing by Zoom for everyone's safety because
 2  of the pandemic.
 3          Is it okay with you if we go forward with this
 4  hearing by Zoom, instead of having you in open court?
 5          MR. FRED HARRIS:  Yes.
 6          THE DEFENDANT:  Yes.  Yes, it is.
 7          THE COURT:  Okay.  All right.  Let's go.
 8          Who is Mr. Harris?
 9          MR. FRED HARRIS:  I am Mr. Harris.
10          THE COURT:  I know.  But who are you?
11          MR. FRED HARRIS:  I'm Richard's father.
12          THE COURT:  Okay.  Unless I specifically address you,
13  if I say "Mr. Harris," I'm talking to your son.  Okay?
14          MR. FRED HARRIS:  Oh.  Okay.  Sorry.
15          MR. WILCOX:  And could you put your cell phone on
16  mute for the time being.
17          THE COURT:  All right.  We're here for a detention
18  hearing.
19          As you know, Mr. Cooley, if you wish, you may proceed
20  by proffer, as long as there is a knowledgeable agent
21  available for cross-examination.
22          If you do proceed by proffer, please let me know what
23  the basis for the request is, whether there is a presumption,
24  and also what kind of guidelines Mr. Harris will be looking at
25  if convicted of any or all of these charges.  Okay?
```

Transcribed from Remote Video Teleconference Recording

```
 1              MR. COOLEY:  Yes, your Honor.

 2              I do have AUSA Mohanty on Zoom.  And it's actually

 3   his case, your Honor, from D.C.  Could he address the Court?

 4              THE COURT:  Everything that is said to Mr. Cooley, I

 5   am now addressing to you, Mr. Mohanty.  But, yes, I'll allow

 6   you to proceed, if you wish.

 7              But do you have an agent available for

 8   cross-examination?

 9              MR. MOHANTY:  We do, your Honor.  Agent Michael

10   McGillicuddy is available.

11              THE COURT:  Okay.

12              MR. MOHANTY:  And proceeding by proffer, your Honor,

13   we don't believe that any of the presumptions apply in this

14   case.

15              The defendant's statutory penalties that he's facing,

16   if convicted on all counts, are approximately 30 years.

17              Having said that, I believe the guideline

18   calculation, based on what I know of his criminal -- limited

19   knowledge of his criminal history, is approximately 15 to 21

20   months, your Honor.

21              Your Honor, we are asking that the defendant be held

22   in this case --

23              THE COURT:  Before we go forward, though, I agree

24   with you that no presumption applies, but does violation of

25   Section 111(a)(1) constitute a crime of violence?
```

Transcribed from Remote Video Teleconference Recording

```
1              MR. MOHANTY:  Your Honor, it is the government's
2    position it does not in this case because he did not have a
3    weapon.  So the government, in other cases in our court
4    arising from this offense, we are taking the position that it
5    does not constitute a crime of violence.
6              THE COURT:  All right.  Then you are going to have to
7    convince me that he is a serious risk of flight or a serious
8    risk that he will obstruct or attempt to obstruct justice or
9    threaten or injure or intimidate, et cetera, a prospective
10   witness, correct, under subsection (e)(2)(b) -- or, rather,
11   (f)(2)(b)?
12             MR. MOHANTY:  Right.  I think that's certainly
13   correct, your Honor.
14             THE COURT:  Okay.
15             MR. MOHANTY:  We do think that he is a serious risk
16   of flight for several reasons, your Honor.
17             First, addressing the factors we need to address,
18   looking at the nature of the offense.  It's a serious offense,
19   your Honor, the fact that he and others, on January 6,
20   obstructed or attempted to obstruct the certification of the
21   electoral college vote, which constitutes an official
22   proceeding.
23             The vice president, as I'm sure the Court knows, was
24   present in congress that day.  No one was allowed in or out of
25   the Capitol Building, except for authorized personnel.
```

Transcribed from Remote Video Teleconference Recording

1          The defendant and others forced their way into the
2  building.  The defendant made a number of statements, and I
3  believe the Court has a still photo, it's hard to show unless
4  you get video to the Court, but there is video that I've shown
5  to Mr. Wilcox, capturing still photo Exhibit No. 1, where the
6  defendant tells a police officer inside the Capitol, who is
7  trying to block them from going into certain areas, the
8  defendant says -- and I may not have the quote exactly, your
9  Honor -- but he says, You're outnumbered.  There's a F'ing
10  million of us out here.  We're listening to Trump, your boss.
11          That caused that police officer to be intimidated and
12  fear for his safety and he stepped back, allowing the
13  defendant and others to go up the stairs.
14          The defendant is also seen in Government's Exhibit 2.
15  The video from that still photograph shows him picking up a
16  telephone inside the Capitol and saying, again, Can I speak to
17  Pelosi?  We are coming for you, you -- the Court will forgive
18  my words, but it's his words -- you bitch.  Oh, Mike Pence,
19  we're coming for you, too, you F'ing traitor.
20          And then, Government Exhibit 3 shows --
21          THE COURT:  Can I assume that when you say "F'ing,"
22  that Mr. Harris didn't say "F'ing"?
23          MR. MOHANTY:  That's correct, your Honor.
24          THE COURT:  You can feel free to use whatever
25  language you need to use.

1          MR. MOHANTY:  I appreciate that, your Honor.  I'm

2    sure the Court knew what I was getting at.

3          THE COURT:  Well, I knew what you were getting at,

4    but I would prefer direct quotes if you're wanting me to rely

5    on what was said.

6          So regarding Pelosi, he picked up the phone.  What

7    phone was this?  I saw that picture.  Is that a phone in the

8    Speaker's office?  Is that a phone in the chambers?  Where is

9    that phone?

10         MR. MOHANTY:  That's a phone in the Capitol Building

11   itself, your Honor.  That is actually, as I understand, there

12   is a landline used by the Capitol Police office.  And he says

13   "We're coming for you, you bitch," regarding Ms. Pelosi.

14         Regarding Vice President Pence, he said, We're coming

15   for you, too, you F -- you fucking traitor.

16         And in regard to his statement to the police officer

17   earlier, he said, "There's a fucking million of us out here."

18         The defendant -- as the Court probably knows, the

19   government has been trying, since January 6, to identify the

20   people, as best it could, that breached the Capitol that day.

21         The defendant was identified through a

22   Be-On-The-Lookout poster, calling for information linked to

23   his identity by somebody that knows him well.

24         As the government attempted to locate him, the

25   defendant traveled through eight different states, beginning

1    on or about February 21st, until his arrest in Florida

2    recently, your Honor.

3            He went through Arizona, New Mexico, Texas, Oklahoma,

4    Arkansas, Tennessee, Alabama, Georgia, and then wound up in

5    Florida.

6            He didn't stay in any of those states for any length

7    of time.  It wasn't like he was looking for a job.  It wasn't

8    like he was site seeing.

9            On March 15, an agent called Mr. Harris in an attempt

10   to -- and advised that she was an FBI agent and that he should

11   call her back, attempting to get him to turn himself in.  He

12   did not return that phone call.

13           The defendant also --

14           THE COURT:  Was that on a cell phone -- I'm sorry.

15   Did he call his home, in Oregon, or did he call his cell

16   phone?  Did he actually call a cell phone that was known to

17   belong to this defendant?

18           MR. MOHANTY:  She called a cell phone that was known

19   to belong to this defendant and that was actually recovered

20   from the defendant at his arrest.

21           THE COURT:  Okay.

22           MR. MOHANTY:  When the defendant was arrested in

23   Florida, he had three cell phones in total.  He admitted to

24   the Pretrial Services officer that he was living out of his

25   car.  He has no income.  No real property.  No ties to

1  virtually any community, your Honor, except for with respect

2  to his father.

3          The defendant was also present at a protest in

4  Portland, Oregon, at the Capitol there, on or about December

5  20 of 2020, where he shoved a journalist who was taking photos

6  of the event.

7          I understand that his father, Mr. Harris, is offering

8  to post money bond for him, your Honor.  As much as I

9  appreciate Mr. Harris looking out for his 40-year-old son, we

10  simply don't think that that is sufficient in this case.

11          I would refer the Court to two cases from the Second

12  Circuit, United States vs. Mercedes, 254 F.3d 433, at page

13  437, a case from 2001, in which the Second Circuit essentially

14  held that when someone is a substantial risk of flight, the

15  fact that a relative is offering to post a money bond is not

16  enough to overcome that risk of flight.

17          So for those reasons, your Honor, we ask that you

18  hold the defendant.

19          THE COURT:  Let me ask you a couple of questions

20  before I turn it over to Mr. Wilcox.  Well, let me ask you one

21  question and then I'll let Mr. Wilcox go.

22          The phone call from the FBI agent to the defendant's

23  cell phone, when was that?

24          MR. MOHANTY:  That was on March 15, your Honor.

25          THE COURT:  And you said that BOLOs went out from

1  Washington.  When did those go out?

2         MR. MOHANTY:  They went out on or about January 7th,

3  or 8th, your Honor.  And this was on January 6th.

4         THE COURT:  And those were BOLOs to police or were

5  any BOLOs issued to the general public?  Was this person's

6  image or identity broadcast publicly or was this just to law

7  enforcement?

8         MR. MOHANTY:  It was broadcast publically, your Honor

9  and on the FBI's website and through posters around the

10  country.

11         In fact, several sort of laypersons, for lack of a

12  better word, your Honor, were able to connect him, although

13  they didn't know his name, were able to point out through

14  Twitter that he was the same person who had been present at

15  the Oregon incident based on his clothing, his appearance and

16  the distinctive tattoo on his right arm.

17         THE COURT:  All right.  Thank you.

18         MR. MOHANTY:  Thank you, your Honor.

19         THE COURT:  Mr. Wilcox, did you want to

20  cross-examine?

21         MR. WILCOX:  Yes, your Honor.  But I'm going to

22  object to the Court considering the Oregon incident.  He is

23  not charged with that.  It's hearsay.  There is really no

24  probable cause for this Court to believe that that act of

25  crime actually occurred.

Transcribed from Remote Video Teleconference Recording

```
1              THE COURT:  I'll let you inquire into it, and then
2    I'll reserve ruling on your objection and let you know whether
3    I'm going to consider it and, if so, to what degree.
4              So did you want to cross the agent?
5              MR. WILCOX:  Yes, your Honor.  I will, just briefly.
6              THE COURT:  All right.  Who is the agent?  I don't
7    see a name.
8              Agent McGillicuddy -- there he is.  Right in the
9    middle.  You are hiding right in plain site.
10             All right.  Do you want to swear him in, please?
11             COURTROOM DEPUTY:  Yes, sir.
12                      MICHAEL J. McGILLICUDDY,
13       having been first duly sworn, testified as follows:
14             COURTROOM DEPUTY:  State your name, sir, and let us
15   know what agency you work for.
16             THE WITNESS:  My name is Michael J. McGillicuddy.  I
17   work for the FBI's Washington field office.
18             THE COURT:  All right, Agent.  Did you hear the
19   proffer?
20             THE WITNESS:  I did, yes.
21             THE COURT:  Was it accurate?
22             THE WITNESS:  Yes.
23             THE COURT:  Is there anything you would like to
24   change, correct or add?
25             THE WITNESS:  Nope.
```

Transcribed from Remote Video Teleconference Recording

1          THE COURT:  Are you prepared to adopt that as your

2  direct testimony?

3          THE WITNESS:  Yes, I am.

4          THE COURT:  All right.  Mr. Wilcox, you may inquire.

5                      CROSS-EXAMINATION

6  BY MR. WILCOX:

7  Q.  Good morning, Agent McGillicuddy.

8  A.  Good morning.

9  Q.  Have you seen the video and photographs that were

10  referenced by --

11          THE COURT:  Sounds like there is a toddler in the

12  background.  Would somebody -- I assume that's not the

13  cellblock -- somebody have a kid in the background?

14          UNIDENTIFIED MAN:  I do, your Honor.  I'm going to

15  put me on mute, unless I'm answering a question.

16          THE COURT:  Okay.  Is it necessary to have the kid in

17  the office with you, or wherever you are?

18          UNIDENTIFIED MAN:  I'm at home this morning, your

19  Honor.  My kids are on online school.

20          THE COURT:  All right.

21          Mr. Wilcox, go ahead.

22  BY MR. WILCOX:

23  Q.  Agent McGillicuddy, have you seen a photograph and video

24  referenced by assistant United States attorney Mohanty?

25  A.  I have, yes.

1   Q.   Besides those videos and photographs, is there any other

2   evidence showing Mr. Harris inside the Capitol?

3   A.   Yes, there are -- yes, there is.

4   Q.   What other evidence?

5   A.   The United States Capitol Police provided approximately 19

6   security camera videos of Mr. Harris's movements throughout

7   the Capitol.

8   Q.   Okay.  So there are either 19 still shots or 19 video

9   clips of Mr. Harris moving through the Capitol, is that what

10  you're saying?  Is that fair?

11  A.   Yes.  That's fair.

12  Q.   Okay.  In any of those video or still shots, Mr. Harris

13  was not carrying a weapon such as an axe handle or anything

14  like that.  Is that fair?

15  A.   That's fair.  Yes.

16  Q.   Okay.

17        Mr. Harris in the cellblock, could you mute yourself,

18  please?

19        THE COURT:  I don't think he can, but I will.

20        Mr. Harris, I'm going to mute you.  I will unmute you

21  later on if there is anything you want to say.

22        We're trying to get rid of the background noise.

23  BY MR. WILCOX:

24  Q.   Is there any evidence that Mr. Harris attacked any officer

25  physically?

1  A.  No.

2  Q.  Now the phone that he was speaking on, that phone wasn't

3  actually connected to Nancy Pelosi's office, was it?

4  A.  It was not.  No.

5  Q.  Okay.  Would it be fair to say that he was just making a

6  show for the cameras?  Is that a possible explanation for his

7  actions?

8  A.  It's possible.  I don't know what he was attempting to do

9  with those statements.

10  Q.  Well, he wasn't talking to Nancy Pelosi and he wasn't

11  talking to Mike Pence.  You know that, right?

12  A.  That's correct.  Yes.

13  Q.  Have you spoke to the agent that arrested Mr. Harris?

14  A.  Yes.

15  Q.  Did he make any statement?

16  A.  Not my knowledge.

17       MR. WILCOX:  Your Honor, I don't have anything else.

18  Let me speak with me client briefly, but I don't think I have

19  anything else for the agent.

20       THE COURT:  Do you want to talk to him in a room or

21  by phone or publicly?

22       MR. WILCOX:  I'm going to just call the room.  He's

23  on mute.  I'll put myself on mute, if that's okay with the

24  Court.

25       THE COURT:  All right.  Go ahead.

Transcribed from Remote Video Teleconference Recording

1          I just muted you, Mr. Wilcox.

2      (Pause.)

3          MR. WILCOX:  Your Honor, I don't have any further

4   questions for Agent McGillicuddy.  Thank you.

5          THE COURT:  All right.  Any redirect?

6          MR. MOHANTY:  No, your Honor.

7          THE COURT:  Let me just ask the agent, since it's

8   been raised, what do you know about any involvement Mr. Harris

9   had in any incident in Oregon, and how do you know it?

10          THE WITNESS:  Yeah.  We received some social media

11   information of photographs of Mr. Harris at the Oregon State

12   Capitol.  So my knowledge is limited to still photographs of

13   that scene of him, outside at the Capitol and one still

14   photograph of him shoving a photographer.

15          THE COURT:  You personally reviewed a still

16   photograph and you can identify this defendant?

17          THE WITNESS:  Yes.

18          THE COURT:  And he's shoving a photographer?

19          THE WITNESS:  Correct.

20          THE COURT:  All right.  Mr. Wilcox, did you want to

21   follow up on that?

22   BY MR. WILCOX:

23   Q.  Was he charged in Oregon with any crime related to the

24   shoving of the photographer?

25   A.  He was not.  No.

Transcribed from Remote Video Teleconference Recording

1   Q.   Okay.  And does the video show the incident in its

2   entirety?  Does the video show what the photographer was doing

3   prior to my client shoving him?

4   A.   No.  I have reviewed no video.  I have reviewed only still

5   shots.

6   Q.   It was a still shot.  So you can't say whether or not my

7   client was acting in self-defense, or not?

8   A.   I can't say.

9          MR. WILCOX:  Okay.  Thank you.

10          THE COURT:  All right.  Thank you.

11          Any other evidence, testimony or proffer, from the

12  government?

13          Thank you, agent.  You may stand down.

14          Mr. Mohanty?

15          MR. MOHANTY:  Your Honor, the only other thing that I

16  think I should ask of the Court is that the defendant's cell

17  sites, the cell phone evidence puts him in the Capitol or near

18  the Capitol during the relevant time.

19          I apologize, your Honor.  I should have said that in

20  my initial proffer, but I did mention that to Mr. Wilcox, off

21  the record, earlier.

22          THE COURT:  Are you talking about the U.S. Capitol or

23  the Portland Capitol, or both?

24          MR. MOHANTY:  The U.S. Capitol, your Honor.  We do

25  not have cell sites, as far as I know, for the time period of

1  December.

2  THE COURT:  Okay.  I'll give you an opportunity to

3  argue in a minute, but do you have any other evidence,

4  testimony or proffer?

5  MR. MOHANTY:  No, your Honor.

6  THE COURT:  All right.  Mr. Wilcox, do you have any

7  evidence, testimony or proffer, including letting me know

8  whether the Pretrial Services report is accurate?

9  MR. WILCOX:  Your Honor, I have reviewed the Pretrial

10  Services report.  There are a couple of questions I would like

11  to -- I would like Mr. Fred Harris to answer.  I would like to

12  take the testimony from Fred Harris, Mr. Richard Harris's

13  father.

14  THE COURT:  All right.  I prefer a proffer, but if

15  you want to do testimony, you may do so.

16  MR. WILCOX:  Okay.  No, your Honor, I can do it by

17  proffer.  He's here.

18  Well, he proffered that prior to -- that prior to

19  Mr. Harris going to D.C., that he was -- he had relocated to

20  Oregon.  He had been in Oregon for a while before he took the

21  trip to Washington, D.C.

22  THE COURT:  Before you go further, let me make sure

23  that all the lawyers have read, there is an updated Pretrial

24  Services report sent to me this morning that I have read, I'm

25  not sure you guys have.

1          But it's got a whole paragraph indicating what Fred

2     Harris said to Pretrial.  Do you guys have that?

3          MR. MOHANTY:  I do, your Honor.  I received it from

4     Mr. Cooley.  Thank you.

5          THE COURT:  All right.  Mr. Wilcox, have you reviewed

6     that?

7          MR. WILCOX:  Yes, I have, your Honor.  I reviewed it

8     with Mr. Harris this morning.

9          THE COURT:  Okay.  Go ahead.

10          MR. WILCOX:  So he had been living in Oregon, for a

11     while before he decided to go to Washington, D.C., your Honor.

12          And he can go back there.  I mean, there is room for

13     him to live there and he can live there during the pendency of

14     the case.

15          So that's all I wanted to elicit from Mr. Harris,

16     your Honor, Mr. Fred Harris, the father.

17          THE COURT:  All right.  Mr. Fred Harris, is that

18     accurate?  You would be willing to put up your house and have

19     your son come live with you?

20          THE DEFENDANT:  Is that on me now?

21          THE COURT:  He's muted, but he's indicating yes.

22          It takes a matter of 60 seconds' delay to unmute him.

23          You should be there now, Mr. Harris.

24          MR. FRED HARRIS:  Yes, I am.  I am willing to have

25     him stay with me.

1          THE COURT:  Okay.  Thank you.

2          Any other evidence, testimony or proffer, Mr. Wilcox?

3          You're on mute.

4          MR. WILCOX:  No, your Honor.

5          THE COURT:  All right.  Argument from the government.

6          MR. MOHANTY:  Your Honor, as I indicated earlier, we

7    believe that the defendant remains a substantial flight risk,

8    despite his father's generous offer.

9          And the Court can tell, he traveled, he chose to

10   travel across country to participate in the attack on the

11   Capitol on January 6.

12         Our evidence is strong of his violating the relevant

13   statutes here, including 1815 -- excuse me, 18 U.S.C. 1512(c),

14   which has a penalty of 20 years, and 18 U.S.C. 111(a)(1),

15   which has a penalty of up to 8 years.

16         The defendant has essentially been, in the

17   government's view, your Honor, on the run since that time.  He

18   has been living out of his car.  He has not sought employment.

19   He has not attempted to set community ties virtually anywhere.

20         And I would certainly concede, your Honor, this is

21   not necessarily the type of dangerous cases that perhaps your

22   Honor and I am more aware of, you know, gang violence or drug

23   cases, your Honor.

24         But the defendant has shown, in our view, a real

25   disregard for the law and sort of -- it does not appear that

1   he will -- we're not satisfied that he would appear for

2   further court hearings, your Honor, or that the government

3   could find him for further court hearings.

4           So for those reasons, your Honor, we ask that the

5   Court hold him.

6           THE COURT:  All right.  Mr. Wilcox?

7           MR. WILCOX:  Your Honor, I would proffer that most of

8   the people that have been charged with similar offenses have

9   been released on bond.

10          You can inquire of Mr. Mohanty.  It's my

11   understanding that the only people that haven't been released

12   on bond are people that are possessing weapons and people that

13   are part of the conspiracy, people that are part of Proud Boys

14   or some of these other groups.

15          People that are similarly situated to Mr. Harris have

16   been receiving bond.

17          Mr. Mohanty is free to rebut that, but I believe that

18   that is accurate, based on my review of internet sites and my

19   review of -- and my speaking with the federal public defenders

20   in the District of Columbia, your Honor.

21          He has one prior, your Honor, and that's a

22   20-year-old prior for marijuana, a marijuana sale.  He would

23   indicate that -- he would proffer that that was a situation

24   with him being in the wrong place at the wrong time.  Other

25   than that, he has no priors.

1          He has ties to the United States.  He is a citizen.
2    He has twins that are six months old.
3          His father has substantial equity in his home.  I
4    would submit that he would not want to risk his father's home
5    by fleeing in this case.
6          He is only facing a guideline sentence of 15 to 21
7    months, as conceded by the government.  To suggest that he
8    would put his father's home and/or money at risk just so he
9    could avoid serving a 15 to 21 month sentence, I don't think
10   is reasonable, your Honor.  I don't think that's a reasonable
11   argument.
12         Again, your Honor, I think there have been about 300
13   arrests, and the vast majority of these people have been
14   released.  And, your Honor, from what I gather, the people
15   that have been released, when they are -- they are from all
16   over the country.
17         And they are having these hearings via Zoom.  I mean,
18   the defendant is allowed to appear at these hearings via Zoom.
19   And Mr. Mohanty can correct me if I'm wrong about that.
20         So I think this is a case where the Court can set
21   maybe a $150,000 personal surety bond, to be cosigned by Fred
22   Harris, collateralized by his home, and a 10 percent bond that
23   the Court thinks is reasonable.
24         THE COURT:  All right.  Thank you, to both sides, for
25   your presentation.

1                To begin with, as we discussed at the outside, this

2      is not a presumption case and it's not even a case that

3      normally would be appropriate for pretrial detention.  So I

4      believe we are operating under subsection (f)(2), which

5      requires a finding of the serious risk of flight or serious

6      risk that the person would obstruct or attempt to obstruct

7      justice, et cetera.

8                Mr. Wilcox, you filed, this morning, a memorandum

9      opinion from D.C., which I was able to read before court.  And

10     I think it's instructive so I'm going to somewhat follow the

11     guidelines there.

12               I don't know whether it's true or not that people

13     have been released all over the country.  I just know what I

14     see in the papers, and I'm not going to rely on that.  But I

15     am going to look at this opinion from Chief Judge Howell,

16     where someone was released in Kansas City by a magistrate

17     judge, and that was overturned and the defendant was put into

18     custody.

19               And there is a decent framework here from the chief

20     judge of Washington, D.C., about what we should consider, and

21     I'm going to follow that.

22               For starters, on risk of flight, I do appreciate

23     Mr. Harris here, but I'm going to find that he is a serious

24     risk of flight.

25               Prior to this incident, he was itinerant.  Even when

1  he was living in Oregon, according to the Pretrial Services
2  report, he still lived in his car for about four months before
3  he moved into his house.  And then he left the house and was
4  traveling around for 11 weeks.
5          He was involved, there is certainly enough evidence
6  to believe that he was involved in the incident at the
7  Capitol.  There is also evidence that he would have known that
8  he was wanted for prosecution.
9          During that time, the government has proffered that
10 he traveled through, was it eight different states, setting
11 down no ties anywhere.  And when he was arrested here in
12 Florida, where he has no ties, he was living out of his car.
13         So he has no ties here.  He has no ties to
14 Washington, D.C.  And even the ties that he does have in
15 Oregon, he left that place and didn't go back to it.
16         I don't know if it's fair to characterize him as
17 being on the run, but he certainly was a rolling stone, with
18 no ties kept down anywhere when he had every reason to know,
19 including a phone call from the FBI, that he was wanted for a
20 crime.  So I find that he is a risk of flight.
21         With respect to danger to the community, it's not a
22 normal case for detention because it's not a crime of violence
23 and there is no weapon involved.
24         However, just quickly going through the factors that
25 Judge Howell suggested looking at, differentiating between a

1  felony and a misdemeanor, looks like two felonies and three

2  misdemeanors, so certainly there are serious charges here.

3          I don't really see any evidence of prior planning.  I

4  guess the fact that he was in Oregon, and then he was in

5  Washington, suggests a pattern, but I don't know if it

6  suggests any real planning.

7          And what Judge Howell concentrated on was coming to

8  Washington, with tactical gear, weapons, et cetera.  I don't

9  see any evidence of that on behalf of Mr. Harris.  And I

10 haven't heard any allegation that he's a member of the Proud

11 Boys or any other group that was involved in organizing.

12         And use or carrying of a dangerous weapon, I don't

13 see that here either.  So that weighs in the defendant's

14 favor.

15         However, the next two factors include coordination

16 with other participants before, during or after the riot, and

17 a defendant who assumed either a formal or de facto leadership

18 role in the assault by encouraging other rioters' misconduct,

19 for example, by urging rioters to advance on the Capitol or to

20 confront law enforcement may have inspired further criminal

21 conduct on the part of others.

22         He certainly knew that he was in front of cameras.

23 Even if he clearly knew that he wasn't talking to Speaker

24 Pelosi or Vice President Pence, if he was in front of cameras,

25 giving what are pretty direct threats to the Speaker of the

1  House and the vice president of the United States, I think
2  that constitutes both provoking the mob and also assuming sort
3  of a de facto leadership role.

4          And likewise, with what he did, seeing the picture of
5  him at the head of the crowd, threatening the police officer,
6  Judge Howell differentiates between somebody who just remained
7  on the grounds and milled about, et cetera, as opposed to
8  someone who injured, attempted to injure or threatened to
9  injure others or who damaged or attempted to damage property.

10         And then, grave concerns are implicated if the
11  defendant actively threatened or confronted federal officials
12  and law enforcement or otherwise promoted or celebrated
13  efforts to disrupt the certification of the electoral vote
14  count during the riot by encouraging others to engage in such
15  conduct.

16         These factors measure the extent of a defendant's
17  disregard for the institution of government and the rule of
18  law, qualities that bear on both the seriousness of the
19  offense conduct and the ultimate inquiry of whether defendant
20  will comply with conditions of release.

21         I have evidence before me that he was at the head of
22  an angry group of people going into the Capitol.  They are
23  being restrained by a police officer, and he told them you're
24  outnumbered, there is a fucking million of us out here and
25  we're listening to Trump.

1            And at that point the officer, the proffer was that

2    the officer was in fear for his safety, stood aside, and let

3    the mob proceed.

4            And then we have additional photographs of Mr. Harris

5    with his arm around a statue of Gerald Ford and on the phone,

6    pretending to talk to Pelosi and Pence, saying We're coming

7    for you.

8            I can't release someone under those circumstances.

9    I'm going to find that he is a risk of flight and a danger to

10   the community.

11           I'll follow up with a written order and that will be

12   out shortly.

13           MR. COOLEY:  Your Honor, the other day we discussed

14   removal.  And I don't think --

15           MR. WILCOX:  Your Honor, may I be heard, briefly?

16           I would just point out that the government wasn't

17   proceeding on danger.  And that on page 13 of this order, the

18   judge -- the reason I sent it to you is because I wanted you

19   to be aware that not all the rioters charged with offenses

20   were being held, and that the court has not been uniformly

21   granting the government pretrial detention.

22           And I understand the Court went through those

23   factors, but it seems to me that the father's house would

24   allay any fears that he would not show up for court.

25           Thank you, your Honor.

1           THE COURT:  Well, I disagree.  And you also proffered
2    that he has got, what did you say, two six-month-old twins at
3    home and living out of his car in eight different states for
4    the last three months.  So I'm not satisfied about ties.
5           So you haven't really -- and I disagree with you, but
6    I'll let Mr. Mohanty speak for himself.  At the outset, I
7    asked if they were proceeding on those two prongs and I
8    thought he said yes.
9           Mr. Mohanty, were you requesting under only risk of
10   flight?  Or danger to the community as well?
11          MR. MOHANTY:  Your Honor, danger to the community as
12   well.  I think what I said is there was a presumption of
13   dangerousness under the statute.
14          THE COURT:  Right.  And that's what I thought.  And
15   I'm proceeding under heightened standard, finding under that
16   heightened standard that he qualifies for danger to the
17   community.
18          And, Mr. Wilcox, I'm not really paying much attention
19   to what other judges elsewhere have done, but I will say this
20   is not my first Capitol rioter case, but it is the first
21   detention case.
22          So I have released people; I'm not releasing this
23   one.
24          We talked about removal the other day, but I don't
25   think we got as far as actually a waiver.

Transcribed from Remote Video Teleconference Recording

```
 1              Mr. Wilcox, does your client want to waive removal?
 2    Or, if not, are there any additional questions you would like
 3    to ask, and we'll treat this as a removal hearing?
 4              MR. WILCOX:  May I just have a moment to speak with
 5    him, your Honor?
 6              THE COURT:  Yes.  I'm going to mute you.
 7              I think you just muted yourself.  Okay.
 8         (Pause.)
 9              MR. WILCOX:  Your Honor, we're going to waive
10    removal.  But Mr. Harris would proffer that the reason he was
11    traveling all over the country is because he was seeking to
12    relocate and he was just checking out different states for
13    possible relocation for his girlfriend and the two
14    six-year-old twins.
15              THE COURT:  All right.  Thank you.  My ruling stands.
16              All right.  Mr. Harris, Mr. Wilcox is indicating you
17    want to waive removal, which means you want to agree to go
18    back, voluntarily, to Washington, D.C.
19              I have here a written waiver of removal that you
20    haven't signed, but let me read it to you.
21              It would say I, Richard Harris, charged in a
22    proceeding -- I'm going to unmute you now so that the
23    60-second lag time starts.
24              All right.
25              I, Richard Harris, charged in a proceeding pending in
```

Transcribed from Remote Video Teleconference Recording

1    the District of Columbia with assaulting, resisting or

2    impeding certain officers, and having been arrested in the

3    Southern District of Florida and taken before Judge Hunt, who

4    informed me of the charge and of my right to retain counsel

5    and request the assignment of counsel if I am unable to retain

6    counsel, and to have a hearing or execute a waiver thereof, do

7    hereby waive a hearing before the aforementioned magistrate

8    judge, and consent to the issuance of a warrant for my removal

9    to the District of Columbia, where the aforesaid charge is

10   pending against me.

11        Is that what you want to do?  Give up your right to a

12   removal hearing here, and go back voluntarily?

13        THE DEFENDANT:  Yes, sir.

14        THE COURT:  Mr. Wilcox, is it okay with you if I have

15   Troy give him this written waiver and have him sign it?

16        MR. WILCOX:  Yes, your Honor.

17        THE COURT:  All right.  The record will show that I

18   have taken an oral waiver, and I find that Mr. Harris

19   knowingly, voluntarily and intelligently has waived his right

20   to a removal hearing.

21        Again, Mr. Harris, you're not admitting you did

22   anything wrong.  You are just admitting that there is probable

23   cause and that they have got the guy they're looking for, both

24   of which I would make a finding about based on the hearing we

25   just had, anyway, but by waiving, it makes it more clear.

1          So again, you're not admitting you did anything

2    wrong.  You're just agreeing to go back to face the charges in

3    Washington.

4          I'll sign the commitment today, but Troy will bring

5    up this waiver to you later and your lawyers are advising you

6    need to sign it.  I hope you'll do that as well.

7          So I'll sign the --

8          MR. WILCOX:  Your Honor, may I?

9          THE COURT:  Yes.

10         MR. WILCOX:  Your Honor, may I just say one more

11   thing to him?

12         THE COURT:  Let me put you back on mute.

13         (Pause.)

14         MR. WILCOX:  Thank you, your Honor.

15         THE COURT:  All right.  Is that everything for today,

16   then, Mr. Cooley?

17         MR. COOLEY:  Yes, your Honor.

18         THE COURT:  Mr. Mohanty?

19         MR. MOHANTY:  Yes, your Honor.  Thank you.

20         THE COURT:  Mr. Wilcox?

21         MR. WILCOX:  Yes, your Honor.

22         THE COURT:  Mr. Harris, did you understand everything

23   we did here today?

24         I'm going to ask you to nod or shake your head,

25   because you're on mute.

1          Did you understand everything we did here today?

2          All right.  This is --

3          MR. FRED HARRIS:  I was wondering if I could say

4    something, your Honor?

5          THE COURT:  You're not going to change my mind, but

6    you're free to say what you would like.

7          MR. FRED HARRIS:  I would just like to say probably

8    12 years ago, Richard borrowed $20,000 from me for an

9    investment on repairing a home that he was working on, and I

10   did get paid back.

11         He is pretty reliable and I don't think he would flee

12   on the bail that I am signing.

13         THE COURT: All right.  Mr. Harris, I do appreciate

14   you being here today, I appreciate the offer you made for your

15   son.

16         Just I'm going to have to detain him.  He will be

17   held in custody until the resolution of this case.

18         Thank you.

19         We will be in recess on this case and I'll sign the

20   -- unless there is a reason for me not to sign the order, I'll

21   sign the order of removal as soon as I get the detention order

22   done.

23         All right.

24         Good luck to you, Mr. Harris.

25         THE DEFENDANT:  Thank you, sir.

1          THE COURT:  You will have to stand up and let the

2   marshal know we're ready for the next case.

3

4      (Proceedings were adjourned.)

5

6                              *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Transcribed from Remote Video Teleconference Recording

1

2

3                    TRANSCRIBER'S   CERTIFICATION

4

5          I, Judith M. Wolff, a Certified Realtime Reporter, do

6    hereby certify:

7

8          That I transcribed the proceedings digitally-recorded

9    on March 26, 2021, in the matter of USA vs. Richard L. Harris,

10   Case No. 21-mj-06163-PMH-1;

11

12         That said audio recording of the proceedings were

13   reduced to typewritten form by me; and that the foregoing

14   transcript is a true and accurate record of the proceedings to

15   the best of my skill and ability.

16

17

18   Date:  April 16, 2021

19

20

21

22         s/ JUDITH M. WOLFF, CERTIFIED REALTIME REPORTER
           Signature of Transcriber
23

24

25

Transcribed from Remote Video Teleconference Recording