UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CRIM. NO. 21-00189 (CJN)

UNITED STATES OF AMERICA,
        Plaintiff,

v.

RICHARD L. HARRIS,
        Defendant.
_____/

### DEFENDANT'S REPLY TO GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S BOND REVIEW MOTION

The Defendant, Richard Harris, through undersigned counsel, files his Reply to the Government's Memorandum in Opposition to Defendant's Bond Review Motion ("Memorandum"), (DE 12), and states that:

Based on twenty-seven seconds of video-recordings and a still photograph, the government posits that Mr. Harris "was intent on disrupting the certification process and his threats show that he 'meant business.' " (DE 12:7). But the inferences on which it relies are not supported by – and in some cases are contradicted by – the record.

The government, like the magistrate judge, suggests that Mr. Harris assumed a *"de facto* leadership role" during the events at the Capitol on January 6th. (DE 12:7). But the evidence proffered by the government does not show him inciting – or even encouraging – any other person to take illicit action. The government next alludes to "threats" purportedly made by the Defendant to "law enforcement officers". *Id*. But Mr. Harris never insinuated to the officer who he was addressing in

1

Government's Exhibit 1 that resistance by the officer(s) would be met with force.[1] Similarly, the government does not explain how Mr. Harris "encouraged violence against Speaker Pelosi and Vice President Pence," *id.*, when, by its own admission, the Defendant was the sole participant in the telephone call depicted in Government's Exhibit 2. And finally, Mr. Harris certainly did not "travel[ ] all the way across the country to participate in the attack on the Capitol", *id.*, as he had no advance knowledge that an "attack" was imminent. He simply traveled to Washington to attend President Trump's "Stop the Steal" rally without any nefarious intent. When the events that day shifted to the Capitol, he did not break windows, doors or barricades to gain entry. And once inside, he "attempted neither violence nor vandalism." *United States v. Munchel*, 991 F.3d 1273, 1286 (D.C. Cir. 2021) (Katsas, J., concurring in part and dissenting in part). He is therefore within the lower "category of dangerousness" recognized by the Court in *Munchel*. *Id.* at 1284 (majority decision).

In addressing whether Mr. Harris is a flight risk, the government discounts his explanation that after visiting his girlfriend and newborn twins in California, he was driving to Florida to explore new employment opportunities, querying, "Wouldn't one expect a job seeker to use other easier methods (e.g., the internet) to look for work?" (DE 12:9). The internet, however, is but one method of searching for a job and perhaps not the best one for the types of positions that the Defendant is qualified

---

[1] To the contrary, Mr. Harris suggested to the officer that they had a common goal; defending the officer's "boss".

for. And, more importantly, one would certainly be reluctant to arrange for housing sight unseen, especially when infants will be residing there.

The government then asks, "Isn't a much more likely explanation that, given the repeated and widespread news of the FBI attempting to identify and locate persons who were involved in the assault on the Capitol, that the defendant chose to run?" (DE 12:9). But if the Defendant was in fact attempting to elude capture,[2] he would not have been: 1) driving a car registered in his name; 2) using credit cards in his name; and 3) socializing with friends at public establishments. And, of course, the government's position assumes that Mr. Harris, who was mostly sleeping in his car, was aware of the "news" to which it refers. That speculation does equate to a preponderance of the evidence.[3]

Further, the "Government submits that generally people who are innocently traveling across the country will promptly return a call from the FBI out of simple curiosity." (DE 12:9). Even if this premise is valid in the abstract – but as above, it is mere speculation – the record does not reflect the content of the FBI agent's message or if the Defendant heard it. There may therefore not have been anything to pique Mr. Harris's "curiosity".

---

[2] The magistrate judge at the detention hearing noted that he "d[id]n't know if it's fair to characterize [Mr. Harris] as being on the run, but he certainly was a rolling stone." Defendant's Exhibit B at p. 23.

[3] Similarly, the government's suggestion that "it is reasonable to infer that the defendant realized that law enforcement authorities would be trying to identify him and arrest him given how prominently he was shown in photographs and video from January 6th," (DE 12:9-10), merits little weight.

The government for the first time provides in its Memorandum photographs of an incident in Oregon during which Mr. Harris allegedly pushed a journalist. Those pictures, however, do not show the context in which that incident occurred. Assuming for now that the person depicted in the photograph is indeed the Defendant, all that is shown is his outstretched arms making contact with the journalist. His hands are not balled into fists. He is not striking the journalist in the face or any other vulnerable part of his body. The record does not reflect whether he was provoked. The journalist was apparently not injured. And, although law enforcement officers were likely nearby, Mr. Harris was not arrested. Even if he had been, though, the charge would have been simple battery, a misdemeanor in most jurisdictions and surely not enough to "warrant the exceptional treatment" of pretrial detention. *Munchel*, *supra*, 991 F.3d at 1285.[4]

---

[4] In footnote 5 of its Memorandum, the government appears to be arguing that the Defendant's conduct was an "act[ ] of obstruction of justice." (DE 12:10). It does not explain, however, how pushing a civilian, if that is what in fact occurred, obstructed justice.

WHEREFORE, the Defendant requests that the Court approve his immediate release from custody with appropriate conditions.

Respectfully submitted,
MICHAEL CARUSO
Federal Public Defender

| | |
|---|---|
| s/ Eric Cohen | *s/Kristy Militello* |
| Eric Cohen | Kristy Militello |
| Assistant Federal Public Defender | Assistant Federal Public Defender |
| Attorney for Defendant | Attorney for Defendant |
| Florida Bar No. 328065 | Florida Bar No. 0056366 |
| 150 West Flagler Street | 450 South Australian Avenue |
| Suite 1700 | Suite 500 |
| Miami, Florida  33130-1566 | West Palm Beach, Florida  33401 |
| Tel: 305-530-7000 | Tel: 561-833-6288 |
| Email: Eric_Cohen@fd.org | Email: Kristy_Militello@fd.org |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 17, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day of all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/Eric M. Cohen
Eric Cohen
