UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CRIM. NO. 21-00189 (CJN)

UNITED STATES OF AMERICA,

       Plaintiff,

v.

RICHARD L. HARRIS,

       Defendant.

_____/

## DEFENDANT'S SENTENCING MEMORANDUM

Richard Harris is, by his own admission, "just a normal guy".  Few things impassion him: his relationship with his new bride and her two school-age daughters; a cold craft beer; and the guarantees afforded by the Bill of Rights.  It was his fervent adherence to those constitutional protections on January 6, 2021, that brings him before the Court for sentencing.

When Mr. Harris left home to travel alone to Washington, he did not intend to "storm" – or even enter – the Capitol.  As evidenced by the contretemps at the Oregon State Capitol the month before, he had strong political beliefs and simply wanted to show his support for a president who he believed was the victim of a "stolen" election.  Not expecting violence, he did not bring with him any weapons or tactical gear.  Instead, the only item of a political nature that he took was his familiar blue MAGA hat.

Consistent with his interest in all things Americana, Mr. Harris travelled to the District several days before January 6th to visit historical sights and collect souvenirs.   He had never before been to Washington and he had never before heard a president speak in person.  On the morning of the 6th, he, like tens of thousands of others, attended the "Stop the Steal" rally at the Ellipse.  Having presided over the bench trial in this matter, the Court is familiar with what ensued.

Concededly, Mr. Harris's behavior in and around the Capitol on January 6th was boisterous and, at times, buffoonish.[1]  But he was neither violent nor destructive. His various chants encouraged neither violence nor destruction by others.   And, unlike so many other protestors, he made no attempt to access either the Senate or the House Chamber.

Likely the most troubling aspect of Mr. Harris's conduct that day involves his encounters with United States Capitol Police Sergeant David Millard in the Crypt and the OAP hallway and with Metropolitan Police then – Sergeant (now Lieutenant) Michael Howden in the Rotunda. But after having viewed multiple visual (and sometimes audio) depictions of the episodes concerning Sergeant Millard, this Court found that although Mr. Harris threatened to use force against the officer, he did not assault him.[2]  (Transcript of Verdict at p. 96).  Specific to that conclusion was the Court's determination that: 1) neither Sergeant Millard's testimony nor the video

---

[1] For example, his suggestion that a journalist be thrown over a railing, although perhaps inappropriate, was surely said in jest.
[2] By referencing the Court's findings, the defense is not endorsing each of them as Mr. Harris intends to appeal his conviction on several of the counts in the Second Superseding Indictment.

evidence established that Mr. Harris had physical contact with Sergeant Millard in the Crypt, *id.*; and 2) there was no evidence that Mr. Harris "made bodily contact" with Sergeant Millard in the OAP hallway. *Id.* Of further note, Sergeant Millard acknowledged during his trial testimony that while in the OAP hallway, the protestors, including Mr. Harris, could have overpowered the officers there at any time during the five-minute encounter but did not. Instead, the officers made a strategic decision to move down the hallway towards where they understood another squad was located.[3]

The Court did find that Mr. Harris assaulted Lieutenant Howland by attempting to wrest Howland's baton from him. But the video evidence clearly reflected that Mr. Harris did not initiate contact with the officer. Instead, Lieutenant Howland was among a group of officers who were advancing on a crowd of protestors utilizing their batons to forcibly evict the protestors from the Rotunda. Before Lieutenant Howland reached where he was standing, Mr. Harris had been jabbed with another officer's baton and had seen a nearby protestor struck at least twice in the head by law enforcement. Mr. Harris's grabbing of Lieutenant Howland's baton was thus not an attempt to disarm, but rather a reflexive attempt to avoid injury to himself. Because of their difference in size, if Mr. Harris had intended to divest Lieutenant Howland of his baton, he likely would have succeeded. Instead, after a

---

[3] Although Sergeant Millard described the episode as "not friendly", Mr. Harris injected some levity when he asked Millard for the location of a rest room.

momentary "struggle" over the baton, Mr. Harris released it and walked away from the scrum.

Although Mr. Harris chose to go to trial, he is not without remorse for many of his actions on January 6th.  He did not at trial challenge his guilt on several of the charges against him. He did not dispute the factual bases for others.  In the hallway outside the courtroom, he apologized to Sergeant Millard after having heard Sergeant Millard testify about the impact that the events of January 6th had on him.[4]   For the more than two years that he was at liberty pending trial, his behavior was exemplary. But he could not in good faith plead guilty to Count One of the instant Indictment [5] because he believed then – as he does now- that he did not act "corruptly" that day as he was exercising his cherished  right to protest what he sincerely perceived to be a "stolen" election.

To be clear, Mr. Harris did not fly cross-country due to a sense of fealty to the former President, despite his support of him. His target was instead more institutional.  Even before the 2020 election, Mr. Harris's unrest was simmering due to issues such as COVID restrictions and the perceived disparity between the judicial system's treatment of protesters on the opposite ends of the political spectrum.  He therefore cast his vote for the candidate who he thought best embodied his beliefs. When, as he later explained to Sergeant Millard in the OAP hallway, he concluded that his vote had been nullified and that the rightful victor of the election had been

---

[4]  Lieutenant Howland left the courthouse before Mr. Harris could similarly apologize to him.
[5]  Charging a violation of 18 U.S.C. § 1512(c)(2).

denied, he felt a need to manifest his concern about where he saw our country heading. That motivation explains his presence in Washington on January 6th. If his conduct [6] marginally obstructed Congress's tabulation of the Electrical College votes, that was not his intent. He thus did not act - at least in his view - with "consciousness of wrongdoing", *id.* at 90, but rather with a perhaps misguided commitment to the fundamental principles embraced by our Constitution.

**CASE COMPARISONS**

At least in felony cases, seemingly every Sentencing Memorandum by any party includes a discussion concerning unwarranted disparity in sentencing. [7] Each then provides a list of arguably similar January 6th cases that support the author's recommended sentence. But instead of analyzing whether a particular sentence would create an "unwarranted disparity' – a term not defined by § 3553(a) – a court should consider whether a proposed sentence is "reasonable". *Booker v. United States*, 543 U.S. 220 (2005)(applying a reasonableness standard for appellate review of sentences).[8] An analysis of what courts have done in other cases is certainly

---

[6] The government's trial evidence not surprisingly dwelled on what it opined was Mr. Harris's purportedly obstructionist behavior. But that conduct comprised only a small percentage of Mr. Harris's time in the Capitol. More of his time was spent: 1) taking selfies and videos not to incite others but to memorialize his experience for himself; 2) assisting other protesters who were suffering the consequences of being gassed; and 3) speaking amicably with law enforcement officers in the East Foyer.

[7] Section 3553(a)(6) of Title 18 ("3553(a)") directs a sentencing court to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"

[8] The sentence imposed should be "sufficient, but not greater than necessary, to comply with the purposes" of sentencing codified in § 3553(a).

germane to that consideration.  The comparison should focus on "defendants with similar records who have been found guilty of similar conduct [.]" § 3553(a)(6).[9]  The offense(s) of conviction deserve little, if any, weight as they are often the result of inconsistent - and, at times, arbitrary – prosecutorial charging decisions.[10],[11]  The determination of whether conduct is "similar" is to come degree subjective as each individual judge must evaluate where on the continuum of culpability any individual defendant falls.

Mr. Harris posits that the following cases are sufficiently similar to his to assist this Court in its consideration of a reasonable sentence here:

1) *United States v. George Tenney, III*, Case No. 21-640 (TFH): Prior to January 6th, Tenney communicated on Facebook that, "It's starting to look like we may siege the capitol [sic] building and congress [sic] if the electoral votes dont [sic] go right."  (DE 73:6).  On the 6th, after entering the Capitol, he attempted to – and

---

[9] See *Booker, supra* at 253-4 ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity… That uniformity does not consist simply of similar sentences for those convicted of violations of the same statute – uniformity consistent with the dissenters' remedial approach.  It consists, more importantly, of similar relationships between sentences and real conduct, relationships that Congress' sentencing statutes helped to advance and that [the dissent's] approach would undermine.")(remedial opinion).

[10] For example, in the instant case, the Indictment evolved from five counts charging two felonies, (DE 1), to seven counts charging three felonies, (DE 35), and ultimately to eleven counts charging five felonies, (DE 51), although Mr. Harris's underlying conduct did not change.

[11] As an accused's advisory sentencing range is in large part determined by the offense(s) of conviction, a comparison of applicable guidelines ranges similarly has little value.

ultimately succeeded in – pushing open the Rotunda Doors, overcoming resistance from police standing outside. *Id.* at 15. When an employee of the House Sergeant of Arms intervened and tried to close the doors, Tenney grabbed him from behind and then pushed him. *Id.* at 16-17. Shortly thereafter, Tenney "locked arms" with a Capital Police officer and later grabbed the officer's arm. *Id.* at 18-19. During Tenney's confrontation with the officer, dozens of protesters were able to enter the Capitol through the now open Rotunda Doors. When a second Capitol Police officer entered with them, "Tenney shoved him to the side." *Id.* at 24. During this time, Tenney encouraged others to "[s]tand up, Patriots, stand up!" *Id*. at 23. After Tenney pleaded guilty, the government recommended that he be sentenced to 48 months incarceration. Judge Hogan instead imposed a 36-month sentence.

Mr. Harris recognizes of course that Tenney pleaded guilty while he did not. Mr. Harris's justification for that decision – his earnest belief that he did not act "corruptly" – is addressed above. But also unlike Tenney, he did not anticipate a siege of the Capitol before travelling to Washington; he did not have physical contact with two law enforcement officers and a representative of the House Sergeant of Arms; and most importantly, he did not enable other protesters, who then themselves "caused further destruction and damages – physical and property damages", (DE 80:21), to gain entry into the Capitol. Mr. Harris is thus deserving of a lower sentence than Tenney received.

2)     *United States v. Matthew Miller*, Case No. 21-75 (RDM):  Miller did not enter the Capitol on January 6th.   But his conduct was more egregious than most of the protesters who did.

After exhorting fellow protesters to, "come on", Miller threw a full can of beer towards law enforcement officers.  (DE 67: 17-18).  He then approached the Lower West Terrace.  While there, he "agitated" others to engage in what has been termed a "heave-ho", which Judge Moss described as a "mob of people pushing back and forth to crush these officers who were in the tunnel," (DE 73: 51), leading to the Capitol itself.  He then threw what were believed to be batteries at the officers in the tunnel before ultimately spraying a fire extinguisher towards a dozen or more of them there. (DE 67:24-5).[12]  Miller also pleaded guilty.  Judge Moss rejected the government's request for a 51-month sentence and imposed a 33-month sentence instead despite his recognition that there likely was not "any portion of the assault on the Capitol that was as dangerous as the assault that took place in the tunnel on the Lower West Terrace, with the law enforcement officers in that space trying to protect the Capitol from attack."  *Id.* at 69.  Judge Moss explained that the lower sentence was justified by: 1) Miller's "exemplary behavior while on pretrial release", *id.* at 71;  2)  his lack of "other significant interaction with the law", *id.*;  but 3) mostly, his age (22 years old).  *Id.* at 72.

---

[12] Judge Moss described Miller's actions as "deeply, deeply troubling to me." (DE 73:52).

Again, Mr. Harris's case differs from Miller's as he proceeded to trial. And he was 40 years of age rather than 22 years of age on January 6th. But, like Miller, his behavior while on release was "exemplary" and his only prior conviction resulted from the protest in Oregon shortly before January 6th. More importantly, he, unlike Miller, did not purposefully endanger multiple law enforcement officers. As Judge Moss described in sentencing Miller:

> [I]t's also the officers who were in that tunnel and who were traumatized by the events that occurred that day. Their skin was burned, their eyes were burned by the firing of the fire extinguisher. They were undoubtedly unnerved, if not terrified, by the crowd outside surging at them, and by Mr. Miller's participation in that crowd with the heave – ho and pushing back against them in every way. (DE 73:73).

Nothing that Mr. Harris did that day remotely compares to the danger posed by what Miller did. His sentence should reflect that difference.

3)    *United States v. Pauline Bauer*, Case No. 21-386 (TNM): While in the Rotunda, Bauer yelled to Metropolitan Police officers, "we want Nancy Pelosi, that's who we want." (DE 180:10).[13] She followed up by claiming, "we want to hang that fucking bitch." *Id.* When an officer tried to direct her away from where she was standing, she responded with an expletive and a shove. *Id.* at 11. She too opted for a bench trial, during which she lied. The government suggested that a 70-month sentence was appropriate. Judge McFadden disagreed and sentenced Bauer to 27 months imprisonment.

---

[13] As a transcript of Bauer's sentencing has not yet been prepared, the facts set out here are elicited from the government's Sentencing Memorandum.

The similarities between Bauer's and Mr. Harris's cases are striking.  Both evoked Speaker Pelosi's name.  Bauer, however, was more bellicose and addressed her comments directly to law enforcement officers. Mr. Harris spoke into a phone with an audible dial tone.  Both also at one point laid hands on an officer's baton. But where Mr. Harris almost immediately released his grip and walked away, Bauer then pushed the officer with both of her hands. (DE 186:13).  And, of course, Mr. Harris did not obstruct justice either before, at, or after trial. If Bauer's sentence is reasonable, the same sentence for Mr. Harris would be as well.

4)   *United States v. Garret Miller*, Case No. 21-119 (CJN):   Having sentenced Miller, this Court is more familiar with the facts supporting his conviction than the undersigned.[14]   As gleaned from the government's Sentencing Memorandum, Miller brought with him to Washington what he called his "riot gear": "rope, a grappling hook, a mouth guard, and a bump cap."  (DE 141:1).  Upon arriving on the Capitol grounds, he twice breached the police line established at the bottom of the steps on the East Front.  *Id.* at 12.  After the second, he "struggl[ed]" with a police officer.  *Id.*  Miller eventually entered the Capitol through the Rotunda Doors.  While inside, he "showed signs of aggression" and had "physical contact with no less than six officers", *id.* at 18, 20, one of whose baton he grabbed.  *Id.* at 18.  That evening, he posted "Assassinate AOC" [15] on social media.  He pleaded guilty on the morning of trial.  Despite the government's request that the Court impose a 48-month sentence,

---

[14]  Again, no sentencing transcript has been prepared.

[15]  Representative Ocasio-Cortez.

Miller was sentenced to 38 months.  We are not so audacious to presume the Court's reasoning.  But it does appear that Miller's conduct on and before January 6th was significantly more culpable than Mr. Harris's.

     5)   *United States v. Julio Baquero*, Case No. 21-702 (JEB):  While in the Rotunda, Baquero joined other protesters in an unsuccessful attempt to forcibly oust police officers.  (DE 48:6).[16]  When the officers began to push back, Baquero grabbed the hand of an officer who was holding a baton.  *Id.* at 7.  He continued to resist law enforcement's efforts to remove him from the Rotunda, calling the officers "traitors".  *Id.* at 8.  Later, he sought to prevent interior doors from being closed by "brac[ing] his back against the door, using his body weight to keep it open."  *Id.* at 10.  After being "torn away from the door," *id.*, he shoved a Capitol Police officer away.  Baquero pleaded guilty.[17]  Chief Judge Boasberg sentenced him to 18 months imprisonment although the government recommended a sentence of 27 months.

     Again, the only significant difference between Mr. Harris and Baquero is that Baquero pleaded guilty while Mr. Harris opted for a bench trial.  Otherwise, they were in the Capitol for about the same time period; and had similar types of confrontations with the police, although Baquero's conduct, especially when trying to prevent officers from closing a door on other protesters seeking to enter, was more willful.  His guilty plea alone cannot therefore justify the difference between the

---

[16] A transcript of Baquero's sentencing proceeding has not been prepared.

[17] Notably, although Baquero was inside the Capitol for approximately 50 minutes, (DE 48:12), and had physical contact with at least two officers, he, unlike Mr. Harris, was not charged with a violation of 18 U.S.C. § 1512(c)(2); an example of the government's contradictory sentencing policies.

sentence he received and the sentence that the government is proposing for Mr. Harris.

6)    *United States v. Michael Perkins*, Case No. 21-447 (CJN):  Perkins, as the Court may recall, did not enter the Capitol itself on January 6th.  But while on Capitol grounds, he picked a flagpole off the ground and threw it at nearby police officers.  (DE 249:43).  He then picked up another and swung it downwards towards two other officers.  *Id.* at 11.[18]  He later kicked another individual who was laying on the ground.[19]    Perkins, like Mr. Harris, agreed to a bench trial before Your Honor, who found him guilty on all counts.  The Court ultimately sentenced him to 48 months incarceration; well below the 90 months requested by the government.  Again, absent a transcript, the defense does not know the Court's rationale.  But, like Garret Miller's, Perkins's conduct on January 6th was apparently substantially more flagrant than Mr. Harris's.

No two cases, like no two defendants, are identical. [20] The analysis above therefore does not account for all the permutations in the cases cited and in others that, although similar, were not.  But they are indicative of the sentences that judges

---

[18]  Although a transcript of sentencing is not yet available, the Court found during its verdict that Perkins swung at the officers who, based on their reaction, were apparently struck.  (DE 255:8).

[19]  The parties disputed whether this individual was a law enforcement officer.  (DE 255:8).

[20]  "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Gall v. United States*, 552 U.S. 38, 52 (2007) quoting *Koon v. United States*, 518 U.S. 81 (1996).

in this District, including Your Honor, have found to be reasonable in January 6th cases in which the defendant's conduct, while not identical, was of a similar – if not greater - culpability as Mr. Harris's.

## MOVING FORWARD

The Court must of course consider both general and specific deterrence when fashioning a reasonable sentence here. § 3553(a)(2)(B). Concerning the former, if the arrests of more than a thousand January 6th protesters to date are not sufficient to deter others from engaging in similar behavior, most respectfully, the sentence imposed on Mr. Harris likely will not either.

Nor is a lengthy sentence necessary to deter Mr. Harris personally from future criminal activity. His exemplary behavior while on bond between June of 2021 and June of 2023 is surely indicative of what can be expected of him in the future. But more importantly, a seismic change in Mr. Harris's personal life has altered his priorities.

Mr. Harris remains passionate about what he views as a downward spiral in American politics.[21] In January of 2021, however, he was essentially unencumbered to leave Oregon for several days to travel to Washington to participate in what he envisioned would be a lawful protest. But he is no longer unencumbered. In April of this year, he wed the former Holly Ramsby. In doing so, he also willingly took on the

---

[21] Several hours before he surrendered to the Marshals on June 26, 2023, Mr. Harris was interviewed on a video podcast. Despite his impending incarceration, he remained adamant that the 2020 election - and specifically his vote - had been "stolen". He further lamented that freedom in the United States was dying; explaining his presence in the District on January 6th.

responsibility of raising Holly's ten-year-old and six-year-old daughters.  But he has done far more than simply ensure that Holly and her girls are clothed, fed and housed. He has in essence become a father to the children.  Holly describes their relationship far better than counsel can in her letter to the Court. [Exh. A].  Because of his additional responsibilities at home - and his understanding now that unforeseen consequences can result from well-intended actions - Mr. Harris is unlikely to again risk participating in any activity similar to what occurred on January 6th.

## CONCLUSION

The sentencing pleadings in January 6th cases are laced with emotive rhetoric from all involved, which is not surprising considering the magnitude of the event. Mr. Harris is asking the Court to ignore the lure - and the allure - of that rhetoric and judge him on what he did that day and what he has done since.  He did not intend to do battle with law enforcement officers.  He did not intend to threaten Members of Congress.  And he certainly did not intend to topple the United States government. He intended simply to express – perhaps too exuberantly – his displeasure with how that government was functioning.   He should be punished for his excessive exuberance; not for the conduct of others that exceeded his expectations.

Respectfully submitted,

MICHAEL CARUSO
Federal Public Defender

s/ Eric Cohen
Eric Cohen
Assistant Federal Public Defender
Attorney for Defendant
Florida Bar No. 328065
150 West Flagler Street
Suite 1700
Miami, Florida  33130-1566
Tel: 305-530-7000
Email: Eric_Cohen@fd.org

s/Kristy Militello
Kristy Militello
Assistant Federal Public Defender
Attorney for Defendant
Florida Bar No. 0056366
450 South Australian Avenue
Suite 500
West Palm Beach, Florida  33401
Tel: 561-833-6288
Email: Kristy_Militello@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 20, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day of all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:     *s/Eric M. Cohen*
                Eric M. Cohen