<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

</div>

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-189 (CJN)** |
| **RICHARD LEE HARRIS,** | |
| **Defendant.** | |

<div align="center">

**UNITED STATES' SENTENCING MEMORANDUM**

</div>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Richard Lee Harris to 70 months of incarceration, three years of supervised release, restitution in the amount of $2,000, and a special assessment of $605. This sentence falls at the midpoint of the defendant's Sentencing Guidelines range of 63-78 months and balances the factors articulated in 18 U.S.C. § 3553.

## I.    INTRODUCTION

The defendant, Richard Lee Harris, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is

<div align="center">1</div>

Harris was a significant figure in the attack on the Capitol on January 6.  He waved rioters forward on the northwest lawn, even prior to rioters breaching the building itself; he breached the building less than two minutes after the initial breach at the Senate Wing Door; he remained inside the building for over an hour and twenty minutes; while inside, he demonstrated a lack of respect for the Capitol building—climbing at least five different statues—and for law enforcement—on several occasions battling police officers that were attempting to prevent rioters from continuing further into the building; and he threatened several individuals while inside the building, including Vice President Mike Pence and Speaker Nancy Pelosi. Finally, and most egregiously, he engaged in two different altercations with police officers. In the first, he threatened and pushed against United States Capitol Police ("USCP") Sergeant D. M., and in the second, he grabbed Metropolitan Police Department ("MPD") Lieutenant M. H.'s riot baton in the Rotunda and forced Lt. M. H. into the angry crowd of rioters. Harris left the Capitol building only after he was forced to leave by police officers.

The government recommends that the Court sentence Harris to 70 months' incarceration, which is the midpoint of the advisory Guidelines' range of 63-78 months for his convictions of  18 U.S.C. §§ 1512(c)(2), 231(a)(3), 111(a), 1752(a)(1), 1752(a)(2), and 1752(a)(4), and 40 U.S.C. §§ 5104(e)(2)(D), 5104(e)(2)(F), and 5104(e)(2)(G)  A 70-month sentence reflects both the gravity of Harris' conduct on January 6 and his lack of remorse for his actions.

---

also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     FACTUAL BACKGROUND

### A.     Harris' Role in the January 6, 2021, Attack on the Capitol

#### *Travel to Washington, D.C. and Approach to the U.S. Capitol*

Harris traveled from Oregon to Washington, D.C. to attend the Stop the Steal Rally scheduled for January 6, 2021. The evening before the rally, while in Washington, D.C., Harris accessed several documents on his phone, including one titled "Reclaiming a superpower" that outlined allegations of voter fraud and provided that "the time for auditing the 2020 U.S. Presidential Election has passed." It set out three possible options for moving forward: "(a) Contingent Election for US President. (b) Accept obvious corruption in United States Government. (c) War." Government Trial Ex. 632, p. 9.

On January 6, Harris attended the Stop the Steal rally at the Ellipse. Toward the end of the rally, Harris marched toward the U.S. Capitol with other protestors. As he marched, he told another individual, "Pence said he would not block. He would not block Biden's electors. They're storming the fucking Capitol now."

#### *Harris' Breach of the U.S. Capitol Building*

Harris marched toward the Capitol and entered the restricted grounds of the U.S. Capitol. On the northwest lawn, Harris came face to face with police officers, many wearing riot gear, who were attempting to prevent rioters from progressing further on the restricted grounds and entering the building. Around this time, Harris, in a selfie video, proudly proclaimed, "They tear gassed us. Front fucking line baby. We're storming the Capitol." On the northwest lawn, Harris also heard loud flash bangs, and he egged on other rioters, waving them forward, closer to the Capitol building, at least ten times. *See, e.g.,* Government Trial Ex. 325.

3

While on the northwest front of the Capitol, Harris witnessed fellow rioters breach a police line at the top of the northwest stairs. In response, he cheered and marched toward that location. *See* Government Trial Ex. 326 at 1:16. He then advanced up the northwest staircase and crossed the northwest courtyard to the Senate Wing Door. At 2:14 p.m., less than two minutes after the first breach of the Capitol building at the same location, Harris breached the Capitol. When Harris entered the building, he celebrated again.

### *Assault of U.S. Capitol Police Sergeant D. M.*

After entering the Capitol, Harris marched to the Crypt, where he encountered a line of police officers. The rioters engaged in a 10-minute standoff with officers before the rioters overwhelmed them. At 2:25 p.m., 11 minutes after Harris entered the building, he and the other rioters surged forward, overwhelming the line of officers. During this surge, USCP Sergeant D. M. was at the front of the line of officers, directly facing Harris, who was at the front of the line of rioters. *See, e.g.,* Government Trial Ex. 001 at 7:09-7:11. Sgt. D. M. put his arm up in front of Harris to protect himself from an impending assault. *Id*. In turn, Harris lowered his arms and fists near his shoulders, assuming a fighting position. *See id*.

Sgt. D. M. and the other police officers on the line were physically pushed backward. Harris remained directly in front and pushed against Sgt. D. M. Trial Tr. 214:9-14 ("Q. And so you think, based on your recollection of the day and reviewing the videos, that in light of those two things together, you believe with some degree of certainty that it was the Defendant who was pushing up against you? A. Yes, I do. Yes, sir."); *see also* Image 1, Government Trial Ex. 301. At trial, Sgt. D. M. testified that, during this push in the Crypt, "I found it difficult to breathe. I had no control over my extremities. I was unable to put protective covering over my firearm. I was completely at

4

the mercy of this crowd and their surge and attempts to push past us." Trial Tr. 166:3-7; *see also* Trial Tr. 166:12-16, 213:12-19. During this encounter, Sgt. D. M. was concerned for his safety, see Trial Tr. 166:8-10, and while in the Capitol on January 6, and possibly during this encounter, Sgt. D. M. broke a finger. Trial Tr. 214:18 to 215:15.



**Image 1: Harris pushing forward toward Sgt. D. M. in the Crypt;
Government Trial Ex. 301, 1:05**

After this interaction, Harris pursued Sgt. D. M., following him to the Office of the Attending Physician ("OAP") Hallway around the corner from the Crypt. Between 2:27 and 2:31 p.m., Harris, standing face to face with Sgt. D. M. and at times pointing in his face, led a group of rioters in shouting at Sgt. D. M. and the other police officers. *See* Images 2, 3, Government Trial Ex. 303. At one point, Harris yelled at Sgt. D. M., "Stand down. You're outnumbered. There's a fucking million of us out there. And we are listening to Trump – your boss." Seconds later, again in Sgt. D. M.'s face, he yelled, "We tried to vote. We tried to vote. Stand down."

5



**Images 2, 3: Harris confronting Sgt. D. M. outside the Office of the Attending Physician; Government Trial Ex. 303 at 17:55 and 18:04**

### *Harris Disrespected the Capitol Building*

Not only did Harris fail to follow commands from the many lines of officers he encountered on Capitol grounds and inside the building on January 6, but Harris also disrespected the building itself. While in the Rotunda and the Old Senate Chamber, Harris climbed at least five different statues from 2:36 p.m. to 3:03 p.m.

At 2:36 p.m., shortly after entering the Rotunda, Harris climbed a statue of President Dwight D. Eisenhower. *See* Image 4, Government Trial Ex. 333; *see also* Government Trial Ex. 1000 at 1:13:06 (2:36:41 p.m.). Two minutes later, Harris climbed a statue of President Ronald Reagan and, within minutes, Harris climbed a third statue—that of President Gerald Ford. *See* Image 5, Government Trial Ex. 1000 at 49:20 (Harris climbing statue of President Reagan); Image 6, Government Trial Ex. 315 (Harris climbing statue of President Ford); *see also* Government Trial Ex. 1000 at 50:27 (2:39:44 p.m., Harris climbing statue of President Ford). After climbing the President Ford statue, Harris placed his own blue camouflage "MAGA" hat on the statue's head.

He then accepted a red hat from another rioter and placed that hat on the statue. Approximately 25 minutes later, at 3:03 p.m., Harris climbed a final statue in the Rotunda. *See* Image 7, Government Trial Ex. 1000 at 52:334 (3:03:13 p.m.). Rather than another former president, Harris stood on a statue of three suffragettes, Lucretia Mott, Elizabeth Cady Stanton, and Susan B. Anthony. Finally, Harris climbed a fifth statue near the Old Senate Chamber. From that higher vantage, Harris led rioters in a chant of "Whose House? Our House!" *See* Image 8, Government Trial Ex. 307 at 1:27.



**Image 4, Trial Ex. 333: Harris climbs statue of President Dwight D. Eisenhower**



**Image 5, Trial Ex. 1000 at 49:20: Harris climbs statue of President Reagan**

  

**Image 6, Government Trial Ex. 315: Harris climbs statue of President Gerald Ford**

**Image 7, Government Trial Ex. 1000 at 52:34 (3:03:13 p.m.): Harris climbs statue of suffragettes**

**Image 8, Government Trial Ex. 307 at 1:27: Harris climbs statue in Old Senate Chamber**

Even other rioters—who themselves had stormed the Capitol building—admonished Harris and entreated him to stop disrespecting the Capitol. While he was standing on a bench near one of the large paintings in the Rotunda, a rioter said to Harris, "Hey, come on, man. Be respectful of that. Shit. Can't you stand down there?" Harris, failing to heed the request of the fellow rioter and demonstrating the entitlement he felt, replied, "We're being tear gassed! I don't know if you noticed." Government Trial Ex. 331 at 1:03:56 to 1:04:07. A third rioter then chided, "Don't be disrespectful of the property."

### Harris' Threats to Vice President Pence, Speaker Pelosi, and a Journalist

Along with the threats Harris shouted at Sgt. D. M. in the OAP Hallway, Harris also threatened Speaker Nancy Pelosi, Vice President Mike Pence, and a journalist while inside the Capitol. In the Rotunda, Harris picked up a landline used and owned by U.S. Capitol Police. Into

the phone, Harris yelled: "Can I speak to Pelosi? Yeah, we're coming, bitch. Oh, Mike Pence? We're coming for you, too, fucking traitor." *See* Government Trial Ex. 1000 at 2:37 p.m.

Shortly after making these threats, Harris left the Rotunda and headed to an area near the Old Senate Chamber, still on the second floor of the Capitol. Harris passed an atrium with an opening to the first floor, where he overheard another rioter criticizing a journalist. Harris responded, "Let's throw him over, throw him over." *See* Government Trial Ex. 345, 9:22 to 9:52.

### *Assault of Metropolitan Police Department Lieutenant M. H.*

Upon returning to the Rotunda, Harris encountered yet another line of police officers. Once again, he found himself on the front line, this time, face to face with Metropolitan Police Department Lieutenant M. H. At approximately 3:07 p.m., Harris grabbed Lt. M. H.'s riot baton and yanked on it several times. *See* Image 9, Government Trial Ex. 204. Harris pulled with such force that he dragged Lt. M. H. forward several feet, into the mob of rioters. Lt. M. H. regained control of his weapon only after he received assistance from another officer. Lt. M. H. testified at trial, "if you're pulled into an angry crowd that doesn't like you, you're at least likely to get physically beaten, if not risk losing your firearm or other -- other more deadly weapons to the crowd." Trial Tr. 64:22-25.



**Image 9: Harris yanking on Lt. M. H.'s baton; Government Trial Ex. 204 at 3:07:26**

From there, Harris and the other rioters in the Rotunda were corralled into the East Foyer. Harris remained in the East Foyer for another 16 minutes. He did not leave until he was forced to by police officers at approximately 3:36 p.m. As he exited the East Rotunda Doors, Harris took a selfie-style video, in which he exclaimed, "Front line baby" as dozens of officers stood behind him. Government Trial Ex. 626.

Harris remained inside the U.S. Capitol from approximately 2:14 p.m. to 3:36 p.m., or for one hour and 22 minutes. He remained on Capitol grounds even longer.

### B. Harris' Post-Trial Interview

On June 26, 2023, hours before he self-surrendered, Harris gave a 30-minute interview in which he discussed his actions on January 6. *See* Justice in Jeopardy: J6 Political Hostage Crisis, Countdown to Surrender, https://rumble.com/v2zi812-exclusive-j6-countdown-to-surrender-richard-harris-day-915.html (last accessed October 20, 2023). The interview was replete with comments referring to his conduct on January 6 as lawful protesting and characterizing his trial and incarceration as political in nature. Harris' comments throughout the interview demonstrate his failure to understand the wrongfulness of his conduct and his lack of remorse.

## III.    THE CHARGES AND TRIAL

On May 10, 2023, a federal grand jury returned a second superseding indictment charging

Harris with 11 counts:

- Count 1: Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2)
- Counts 2, 3: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3)
- Counts 4, 5: Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1)
- Count 6: Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1)
- Count 7: Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2)
- Count 8: Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4)
- Count 9: Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D)
- Count 10: Act of Physical Violence on the Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F)
- Count 11: Parading, Picketing, or Demonstrating, in violation of 40 U.S.C. § 5104(e)(2)(G)

On June 14, 2023, Harris was convicted of those offenses following a bench trial.

## IV.    STATUTORY PENALTIES

Harris now faces sentencing on Counts 1 through 11.  As noted by the Presentence Report,

Harris faces:

- Twenty years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a special assessment of $100 for Count One, Obstruction of an Official Proceeding;

- Five years of imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, and a special assessment of $100 for Counts Two and Three, Civil Disorder;

- Eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a special assessment of $100 for Counts Four and Five, Assaulting, Resisting, or Impeding Certain Officers;

11

- One year imprisonment, a term of supervised release of not more than 1 year, a fine up to $100,000, and a special assessment of $25 for Counts Six, Seven, and Eight, Entering and Remaining in a Restricted Building or Grounds, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, and Engaging in Physical Violence in a Restricted Building or Grounds, respectively; and

- Six months imprisonment and a fine of up to $5,000 for Counts Nine, Ten, and Eleven, Disorderly Conduct in a Capitol Building; Impeding Passage Through the Capitol Grounds or Building; Act of Physical Violence in the Capitol Grounds or Building; and Parading Demonstrating, or Picketing in a Capitol Building, respectively.

*See* Presentencing Report (PSR) at 1-2.

## V.  THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id*. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id*.

### A.  Guidelines Analysis

The Guidelines analysis follows.

Count One: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property | +8 |

| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[2] | +3 |
| | **Total** | **25** |

Counts Two, Three: 18 U.S.C. § 231(a)(3)

| U.S.S.G. § 2A2.2(a)[3] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

Counts Four, Five:  18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.2(a)[4] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

Count Six: 18 U.S.C. § 1752(a)(1)

| U.S.S.G. § 2X1.1(a) | Base Offense Level | 25 |
| | **Total** | **25** |

Count Seven: 18 U.S.C. § 1752(a)(2)

| U.S.S.G. § 2A2.2.(a)[5] | Base Offense Level | 14 |

---

[2] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Harris corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.9 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

[3] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[4] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[5] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

| U.S.S.G. § 3A1.2(a), (b) | Official Victim | | +6 |
|---|---|---|---|
| | | **Total** | **20** |

Count Eight: 18 U.S.C. § 1752(a)(4)

| U.S.S.G. § 2A2.2.(a)[6] | Base Offense Level | | 14 |
|---|---|---|---|
| U.S.S.G. § 3A1.2(a), (b) | Official Victim | | +6 |
| | | **Total** | **20** |

| **Combined Offense Level** | | | **25** |
|---|---|---|---|

**B.  Grouping Analysis**

Under U.S.S.G. § 3D1.2, "closely related counts" group.

- Group 1: Counts 1, 6, and 7 group because they involve the same victim – Congress – and are also connected by the same common criminal objective: to stop the certification of the Electoral college vote.

- Group 2: Counts 2, 4, and 8 group because they involve the same victim – Sgt. D.M. – and the same threatening and intimidating conduct.

- Group 3: Counts 3 and 5 group, because they involve the same victim – Lt. M.H. – and the same assaultive conduct.

Per U.S.S.G. § 3D1.2(c), Counts 2, 4, and 8 group with Counts 1, 6, and 7, because those counts "embod[y] conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to" the Count One offense of violating 18 U.S.C. § 1512(c)(2). *See* U.S.S.G. § 2J1.2(b)(1)(B) ("the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice.").

Counts 3 and 5 are not grouped with the other Counts, because when there are "several counts, each of which could be treated as an aggravating factor to another more serious count,"

---

[6] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

"the guideline for the more serious count provides an adjustment for only one occurrence of that factor." U.S.S.G. § 3D1.2, cmt. n.5. "In such cases, only the count representing the most serious of those factors is to be grouped with the other count." *Id*. After this analysis, the revised Groups are as follows:

- Group 1: Counts 1, 2, 4, 6, 7, and 8

- Group 2: Counts 3 and 5

Count 1 has the highest offense level for Group 1 (25), and accordingly, the combined offense level for Group 1 is 25. The combined offense level of Group 2 is 20.

Under U.S.S.G. § 3D1.4(a) "the Group with the highest level" counts as "one Unit," and "any Group that is **5** to **8** levels less serious than the Group with the highest offense level" counts as one-half Unit. Accordingly, Group 1 counts as one unit. Group 2 (offense level 20) counts as one half unit. Under the table set out in U.S.S.G. § 3D1.4, when there are 1.5 units, the offense level is increased by 1 level. Thus, the total combined offense level is 26.

### C.  Objections to the PSR

The Presentence Report contains two errors.  First, in Paragraph 49, the PSR notes that U.S.S.G. § 2A2.4 is the guideline applicable to Counts Two and Three; however, the cross-reference from U.S.S.G. § 2A2.4(c)(1) applies because the conduct constituted aggravated assault. "Aggravated assault" is, *inter alia*, "a felonious assault that involved … (D) an intent to commit another felony."  U.S.S.G. § 2A2.2 cmt. n.1. Thus, U.S.S.G. § 2A2.2(a) is the applicable guideline, and the offense level computation for Counts Two and Three is as set forth in Section V(A).

Second, in Paragraph 52, the PSR notes that U.S.S.G. § 2A2.4 is the guideline applicable to Counts Seven and Eight; however, the cross-reference from U.S.S.G. § 2A2.4(c)(1) applies because the conduct constituted aggravated assault. Thus, U.S.S.G. § 2A2.2(a) is the applicable

guideline, and the offense level computation for Counts Seven and Eight is as set forth in Section V(A).

### D.  Obstruction of Justice Enhancements

#### a.  The Court Should Apply the Three-Point Enhancement for Substantial Interference With the Administration of Justice and the Eight-Point Enhancement for Causing or Threatening Injury or Property Damage to Obstruct the Administration of Justice.

The Court should apply both the three-point enhancement for substantially interfering with the administration of justice, under U.S.S.G. § 2J1.2(b)(2), and the eight-point enhancement for causing or threatening to cause injury or property damage in order to obstruct the administration of justice, under U.S.S.G. § 2J1.2(b)(1)(B). *See* PSR ¶¶ 62, 63. The defendant's conduct obstructed the "administration of justice," as that term is used in the Guidelines, because he obstructed the certification of the Electoral College vote.  In announcing its verdict, this Court held:

> I find beyond a reasonable doubt that Harris obstructed the certification of the election. Harris's prolonged and disruptive activity inside the Capitol, his overtaking of police lines to move throughout the Capitol Building and Grounds, and his altercations with specific officers helped interrupt and suspend the certification of the election for several hours. His refusal to leave the Capitol for an hour and 20 minutes impeded the officers' ability to clear the Capitol so that the certification could resume.

Trial Tr. 90:20-91:4.

#### b.  The certification of the Electoral College vote involved the administration of justice as defined broadly in the Guidelines.

Section 2J1.2, entitled "Obstruction of Justice," applies to a variety of obstruction offenses, including all offenses under § 1512 and under 11 other statutes found in Chapter 73 of Title 18. *See* U.S.S.G. § 2J1.2 cmt.; U.S.S.G. Appendix A. It provides for an eight-level increase if the offense involved causing or threatening injury to a person or damage to property "in order to

obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). It also provides for a three-level increase "if the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2).

Section 2J1.2's text, purpose, and commentary all support the conclusion that conduct that obstructs Congress's certification of the Electoral College vote interferes with the "administration of justice" for purposes of the guideline. Administration of justice, in its broadest sense, refers to the proper administration of law by all three branches of government. Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice." Black's Law Dictionary (11th ed. 2019); *see* Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law"). When defining "contempt" to include "[c]onduct that defies the authority or dignity of a court *or legislature*," Black's Law Dictionary observes that "such conduct interferes with the administration of justice." Black's Law Dictionary (11th ed. 2019) (emphasis added). And courts have defined "administration of justice" to mean "the performance of acts or duties required by law," *Rosner v. United States*, 10 F.2d 675, 676 (2d Cir. 1926) (quotation omitted), or "the performance of acts required by law in the discharge of duties," *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977).

To be sure, the term "administration of justice" is more commonly used in a narrower sense to refer to "interference with the pendency of some sort of judicial proceedings." *In re Kendall*, 712 F.3d 814, 828 (3d Cir. 2013); *see In re McConnell*, 370 U.S. 230, 234, 236 (1962) (defining the term in the contempt context as relating to "the performance of judicial duty"); *United States*

17

*v. Aguilar*, 515 U.S. 593 (1995) (stating that the "omnibus clause" of 18 U.S.C. § 1503, which criminalizes obstruction of the "due administration of justice," requires proof of "an intent to influence judicial or grand jury proceedings"). But there are compelling reasons for concluding that "administration of justice" bears its broader (albeit less common) meaning in U.S.S.G. § 2J1.2.

First, § 2J1.2's context and purpose support the broader reading of "administration of justice" in both (b)(2) and (b)(1)(B). Section 2J1.2 applies to an array of obstruction statutes, including a number that do *not* involve the "administration of justice" in the narrow sense (i.e., relating to judicial or quasi-judicial proceedings). *See* U.S.S.G. § 2J1.2 cmt. (listing covered statutes); U.S.S.G. Appendix A (statutory index). Those offenses include concealing or destroying invoices or papers relating to imported merchandise, 18 U.S.C. §§ 551; obstructing an investigation under the Workforce Innovation and Opportunity Act, 18 U.S.C. § 665(c); obstruction of proceedings before departments, agencies, and committees, 18 U.S.C. § 1505; obstruction of enforcement of state gambling laws, 18 U.S.C. § 1511; obstruction of official proceedings, 18 U.S.C. 1512; obstruction of a federal audit, 18 U.S.C. § 1516; destruction of documents in agency investigations, 18 U.S.C. § 1519; and interfering with the administration of the Internal Revenue Code, 26 U.S.C. § 7212. Yet under a narrow interpretation of the guideline, the enhancements under §§ 2J1.2(b)(1)(B) and (b)(2) would not apply to those statutes. That is good reason to reject such a reading. *Cf. United States v. Castleman*, 572 U.S. 572 U.S. 157, 167 (2014) (rejecting a reading of 18 U.S.C. § 922(g)(9) that "would have rendered [it] inoperative in many States at the time of its enactment").

Also, Section 2J1.2's background indicates that the Sentencing Commission intended the enhancements to reach the type of violent and dangerous conduct at issue in this case. The

background notes that § 2J1.2 broadly covers crimes "of varying seriousness," including offenses that involve intercepting grand jury deliberations, interfering with an illegal gambling investigation, or obstructing "a civil or administrative proceeding," and that the underlying conduct may "range from a mere threat to an act of extreme violence." U.S.S.G. § 2J1.2 cmt. Background. Within that range, the enhancements "reflect the more serious forms of obstruction." *Id.* The Commission thus crafted the enhancements in § 2J1.2 to cover the most egregious *conduct* in the full knowledge that obstruction-of-justice offenses are not limited solely to interference with judicial proceedings.

Relatedly, limiting subsection (b)(1)(B)'s and (b)(2)'s enhancements to obstruction of judicial proceedings would undermine the purpose of the Guidelines. "A principal purpose of the Sentencing Guidelines is to promote uniformity in sentencing imposed by different federal courts for similar criminal conduct." *Hughes v. United States*, 138 S. Ct. 1765, 1774 (2018). The Guidelines therefore seek to achieve "a strong connection between the sentence imposed and the offender's real conduct." *United States v. Booker*, 543 U.S. 220, 246 (2005). The Sentencing Commission quite reasonably determined, for example, that "causing or threatening physical injury to a person, or property damage, in order to obstruct the administration of justice" is more serious than obstruction not involving such injury or threats and should be punished more severely. U.S.S.G. § 2J1.2(b)(1)(B). And the seriousness of the threatening or injurious conduct does not depend on whether the obstructed proceeding is judicial, legislative, or executive. There is no sound basis for assigning a significantly higher offense level to someone who violently interferes with a court proceeding than someone who violently interferes with a congressional proceeding. *See United States v. Rubenacker,* 21-cr-193 (BAH), May 26, 2022 Sentencing Hearing Tr. at 69

("There is simply no indication in guideline Section 2J1.2 that the [specific offense characteristics] containing the phrase 'administration of justice' were meant to apply to only some of the statutes referenced to this guideline and not to apply to all of the cases involving obstruction of proceedings taking place outside of courts or grand juries; that simply doesn't make sense.")

This is especially true considering that subsections (b)(1)(B) and (b)(2) are not simply two factors among many but are the key sentencing factors in most obstruction cases. The three other enhancements in § 2J1.2 have limited application.  Subsections (b)(1)(A) and (b)(1)(c) apply only to violations of § 1001 and § 1505 relating to sex or terrorism offenses. And subsection (b)(3), a comparatively minor two-level increase, applies only where a document was destroyed or altered or the offense was "extensive in scope, planning, or preparation." U.S.S.G. § 2J1.2(b)(3). Reading the enhancements in subsection (b)(1)(B) and (b)(2) as applying only to judicial or quasi-judicial proceedings would fail to distinguish between the seriousness of offenders' conduct in a wide variety of obstruction offenses covered by § 2J1.2. On the other hand, reading the term "administration of justice" more broadly eliminates this gap in the guideline.

Further, Section 2J1.2's commentary provides a broad definition of "administration of justice." It defines "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or *the unnecessary expenditure of substantial governmental or court resources*." U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). This definition includes interference not only with "court" resources, but also with any "governmental" resources, a term that includes congressional resources. The Supreme Court has held that "commentary in the Guidelines Manual that interprets or explains a guideline is

authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). Because this commentary is consistent with the plain text of the Guideline, which uses the broad term "administration of justice," it is authoritative.

The government recognizes that the commentary defines only the term "substantial interference with the administration of justice," which serves as the basis for the three-point enhancement in U.S.S.G. § 2J1.2(b)(2) and does not specifically define the term "in order to obstruct the administration of justice," which serves as the basis for the eight-point enhancement in U.S.S.G. § 2J1.2(b)(1)(B). But the relevant term "administration of justice" is identical and should be given the same interpretation in both enhancements. The operative verbs "interfere[]" and "obstruct" carry the same meaning in this context. And the adjective "substantial" in § 2J1.2(b) does not change the meaning of "administration of justice," especially since the commentary repeats the word, requiring "the unnecessary expenditure of *substantial* governmental . . . resources." U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). Thus, the term "in order to obstruct the administration of justice" in U.S.S.G. § 2J1.2(b)(1)(B) should be read to include obstructive conduct aimed at nonjudicial governmental activities. A different conclusion would lead to the incongruous result of giving two different meanings to the term "administration of justice" within the same guideline. *See Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").

Obstruction of the Electoral College certification vote on January 6, 2021 falls comfortably within the meaning of "administration of justice" as used in § 2J1.2 because it involved Congress's

performance of duties required by law. Specifically, Congress's certification of the Electoral

College vote was an official proceeding required by both the Constitution and federal statutes.[7]

*See* U.S. Const. art. II, § 1, cl. 3; 3 U.S.C. §§ 15-18. Application of both subsections (b)(1)(B) and

(b)(2) is therefore appropriate here.

> ### c. Courts, including judges on this Court in January 6 cases, have correctly held that non-judicial proceedings can involve the administration of justice.

Other courts have appropriately applied the "administration of justice" enhancements in

U.S.S.G. § 2J1.2(b)(2) to efforts to obstruct a wide range of proceedings that were not limited to

judicial or grand jury proceedings.  *See United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017)

(upholding the application of § 2J1.2(b)(2) after law enforcement officials expended substantial

resources to recover the defendant's children he kidnapped and transported internationally); *United*

*States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009) (applying

§ 2J1.2(b)(2) after a defendant interfered with OSHA investigations into a workplace accident);

*United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998) (applying § 2J1.2(b)(2)

after a defendant withheld subpoenaed documents from a congressional subcommittee).

---

[7] Chief Judge Howell has articulated a different basis on which to apply the enhancement to obstruction of the Electoral College certification. *United States v. Rubenacker,* 21-cr-193 (BAH), Sentencing Hearing Tr. at 69.  She pointed out that Black's Law Dictionary defines "administration of justice" to include the "maintenance of right within a political community by means of the physical force of the state," Black's Law Dictionary (11th ed. 2019), and observed that the joint session of Congress used "'the physical force of the state' in the form of law enforcement officers located in and around the Capitol to secure the proceedings." *Rubenacker,* Sentencing Tr. at 75. This understanding of the guideline is arguably broader than the interpretation advanced by the government because it could apply to any proceeding (or event) at which there was a police presence, rather than being limited to proceedings involving the administration of the law.

Several judges on this Court have applied § 2J1.2's "administration of justice" enhancements in cases arising from the Capitol breach on January 6, both in cases where the parties agreed to their application and where the application was contested.  *See, e.g.*, *United States v. Wilson*, No. 21-cr-345 (Lamberth, J.); *United States v. Hodgkins*, No. 21-cr-188 (Moss, J.); *United States v. Fairlamb*, No. 21-cr-120 (Lamberth, J.); *United States v. Chansley*, No. 21-cr-003, (Lamberth, J.); *United States v. Matthew Miller*, No. 21-cr-075 (Moss, J.) (uncontested, but independently addressed by the Court); *United States v. Rubenacker*, No. 21-cr-193 (BAH) (contested); *United States v. Guy Reffitt*, No. 21-cr-032 (Friedrich, J.) (contested); *United States v. Pruitt,* No. 21-cr-23 (Kelly, J.); *United States v. Robertson,* 21-cr-34 (Cooper, J.) (contested).

### d.  Judge McFadden's contrary conclusion in *Seefried* is unpersuasive.

One judge on this Court, Judge McFadden, has reached a contrary conclusion, concluding that "administration of justice" in § 2J1.2 is limited to "a judicial or related proceeding that determines rights or obligations."  *United States v. Seefried*, No. 21-cr-287, Doc. 123, at 1 (D.D.C. Oct. 29, 2022) (TNM); *see United States v. Rodean*, No. 21-cr-57, Doc. 76 (D.D.C. Oct. 26, 2022) (restricted statement of reasons); *United States v. Secor,* No. 21-cr-157, Doc. 56 at 17-20 (Oct. 24, 2022) (TNM); *United States v. Hale-Cusanelli*, No. 21-cr-37, Doc. 120 at 50-55 (D.D.C. Sep. 27, 2022).  Judge McFadden's reasons for reaching that conclusion, however, are not persuasive.

Judge McFadden first discussed Black's Law Dictionary's definitions of "administration of justice" and "due administration of justice," which, he concluded, "suggest that the 'administration of justice' involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights." *Seefried*, Doc. 123 at 4. He also considered that dictionary's definition of "obstructing" and "interfering with" the administration of justice, a definition that he

23

determined "further corroborates that the 'administration of justice' involves something like a legal proceeding, such as a trial or grand jury hearing." *Id.* at 5. But Judge McFadden did not consider the broader definitions of "justice" and "obstruction of justice" cited above, which relate to the orderly administration of the law more generally. Indeed, Black's Law Dictionary recognizes that "[c]onduct that defies the authority or dignity of a court *or legislature* . . . . interferes with the administration of justice." Black's Law Dictionary (11th ed. 2019) (emphasis added).

Nor does Judge McFadden's corpus linguistics analysis support a different result. Surveying a representative sampling of 375 uses of the term "administration of justice" in legal usage between 1977 and 1987, Judge McFadden found that about 65% of the hits referred to "a judicial proceeding deciding legal rights," about 4% involved "law enforcement activities," and only three entries "referr[ed] to government function generally." *Seefried*, Doc. 123 at 11-13. But the simple fact that the term *usually* bears judicial connotations does not mean that it *must*, particularly where, as here, the guideline's context, purpose, and commentary point in a different direction. Like all words, legal terms often bear multiple meanings. For example, the term "suppression of evidence" can refer either to a court's exclusion of evidence from trial or to the prosecution's withholding of favorable evidence from the defense. Which meaning the term bears in a particular instance cannot be determined by the frequency of each meaning within the legal corpus. And in this case, the frequent use of other meanings is no reason to reject a broader meaning of "administration of justice" that gives full effect to the guideline and corresponds with the commentary's definition.

Judge McFadden was also incorrect in his analysis of § 2J1.2's commentary. *Seefried*, Doc. 123 at 14-17  As an initial matter, he questioned whether the commentary was even "authoritative,"

24

pointing out that the D.C. Circuit "has suggested that courts should eschew deference to the Commission when the commentary expands the meaning of the text of the Guidelines themselves." *Id.* at 14 (citing *United States v. Winstead*, 890 F.3d 1082, 1092 (D.C. Cir. 2018)). But *Winstead* involved a very different situation, in which the guideline's text included a specific list of crimes defined as "controlled substance offenses" and the commentary added an additional *attempt* crime that was "not included in the guideline." *Winstead*, 890 F.3d at 403. The D.C. Circuit held that "[b]y purporting to add attempted offenses to the clear textual definition," rather than "interpret[ing] or explain[ing] the ones already there," the commentary conflicted with the guideline and was not authoritative under *Stinson. Id.* at 404. Here, by contrast, the commentary does not attempt to add to a finite list of offenses, but rather "explain[s]" that the term "administration of justice" bears a broad meaning that includes non-judicial proceedings.

Nor was Judge McFadden correct that—even if it is binding—§ 2J1.2's commentary supports only "a narrower interpretation of the 'administration of justice.'" *Seefried*, Doc. 123 at 15. Although the other definitions in the commentary undoubtedly relate to "investigations, verdicts, and judicial determinations," that fact does not support a definition that excludes congressional proceedings. The commentary's use of the word "includes" indicates that the definition is not an exhaustive list. *See* Antonin Scalia & Bryan A Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012). And the inclusion of the "premature or improper termination of a felony investigation" indicates that the definition applies to executive-branch investigations that are not yet before a grand jury or court.

Reading the commentary's use of the word "governmental . . . resources" to include congressional resources would not, as Judge McFadden concluded, "render[ ] the phrase 'or court'

superfluous." *Seefried*, Doc. 123 at 17. Although a "broad definition" of "governmental" could "include court resources," *id.*, using both terms in an attempt to sweep in all three branches of government is hardly an obvious superfluity. The Sentencing Commission could have added the word "court" to clarify that the term "governmental" did not exclude courts. And the purported superfluity could be avoided by reading "governmental . . . resources" to refer to the resources of both the executive and legislative branches (as opposed to the judicial). The superfluity canon provides no basis to limit the term to "*prosecutorial* resources." *Id.* Moreover, Judge McFadden's interpretation of the commentary runs into its own superfluity problem. If, as he concluded, the term "administration of justice" in § 2J1.2 refers only to "a judicial or related proceeding," *id.* at 1, then the word "governmental" is itself superfluous. This reading should be rejected.

Judge McFadden's concern that a broader reading of "administration of justice" would allow the government to "trigger the enhancements at will" is also misplaced. *Seefried*, Doc. 123 at 16. The enhancements in § 2J1.2 do not apply whenever the offense "caused unnecessary expenditures of its resources" in some attenuated way, such as by causing the government to later bring a prosecution. *Id.* ("While the events of January 6 caused the Government to commit significant resources—evidenced in part by the number of cases charged in this district—this argument proves too much."). Instead, the enhancement is best read as applying where the obstructive conduct itself—not the later prosecution of that conduct—caused the unnecessary expenditure of substantial governmental or court resources. *See United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996) (observing that the case resulted in the expenditure of "substantial resources . . . over and above the routine costs of prosecuting the obstruction offense"). If the enhancement could truly be triggered simply by "charg[ing]" a case, *Seefried*, Doc. 123 at 16, then

even under Judge McFadden's reading the enhancement would apply every time the government brought a felony prosecution, which results in the expenditure of substantial "court" and "prosecutorial" resources, *id.* at 16-17. Judge McFadden's conclusion that "governmental" should be read to exclude Congress simply does not follow from his concerns about excessive application of the enhancements.

Judge McFadden was also incorrect in perceiving a conflict between the government's interpretation of "administration of justice" in § 2J1.2 and the same term in 18 U.S.C. § 1503, which contains a catchall provision prohibiting obstruction of "the due administration of justice." *See Seefried*, Doc. 123 at 5-6 (observing that the government had not charged any January 6 defendants under § 1503), 20-21 (saying it would be "incongruous" to conclude that "official proceeding" means something different in the Sentencing Guidelines than in the statutory context). The Supreme Court has made clear that a term can have a different meaning in the Sentencing Guidelines than it does in a statute. *DePierre v. United States*, 564 U.S. 70, 87 (2011). And there are at least three differences between § 1503 and § 2J1.2 that counsel in favor of reading them differently. First, unlike § 1503, § 2J1.2 includes its own definition of the "administration of justice," which covers the expenditure of "governmental *or* court" resources. Second, § 1503 appears in the context of a statute that applies to jurors, court officers, and judges, which may favor a narrower reading of the catchall provision for interference with the "due administration of justice." And, third, § 2J1.2's entire purpose is to distinguish between levels of culpability for those who violate a wide variety of obstruction statutes, many of which are not limited to judicial or quasi-judicial proceedings.

Judge McFadden's reading of § 2J1.2 also creates difficult line-drawing problems. Under his reasoning, the enhancements in subsection (b)(1)(B) and (b)(2) apply only to offenses where the obstructed proceedings were "judicial" or "quasi-judicial" in nature. *Seefried*, Doc. 123 at 4. But those terms themselves raise difficult questions about how closely the obstructive conduct must "relate[]" to a judicial proceeding or what proceedings can be said to "determine[] rights or obligations." *Id.* at 1. For example, 18 U.S.C. § 1505 applies to obstruction of an investigation by the House Ethics Committee, which has the power to discipline current members of Congress. That inquiry would seem to be "quasi-judicial" and one that "determines rights or obligations," *id.* at 1, 4, yet it does not involve the "possibility of punishment by the state," *id.* at 4. The government's broader reading of "administration of justice," by contrast, would apply to all the obstruction offenses covered by § 2J1.2. Under the government's reading, therefore, a sentencing court need not answer difficult questions about whether a proceeding is sufficiently "judicial" or "quasi-judicial" to trigger subsections (b)(1)(B) and (b)(2).

Moreover, even under a narrower reading of administration of justice, the certification fits within the definition because it has quasi-judicial features. The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* Congress's certification of the Electoral College vote, moreover, must terminate with a decision: Congress may not recess until "the count of electoral votes" is "completed," and the "result declared." 3 U.S.C. § 16. Indeed, for these reasons, several judges on this Court have concluded that Congress's

certification of the Electoral College is a "quasi-adjudicative or quasi-judicial" proceeding. *United States v. Nordean*, 579 F. Supp. 3d 28, 43 (D.D.C. 2021); *see United States v. Robertson*, 588 F. Supp. 3d 114, 121-22 (D.D.C. 2022) (holding that "the certification of the Electoral College vote is quasi-adjudicatory"); *United States v. Caldwell*, 581 F. Supp. 3d 1, 14-15 (D.D.C. 2021) (holding that the certification was "an 'adjudicatory' proceeding").

Therefore, the Court should apply the three-point enhancement for substantial interference with the administration of justice and the eight-point enhancement for causing or threatening injury or property damage to obstruct the administration of justice.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case sentencing is also guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A. **Nature and Circumstances of the Offense**

As shown in Section II(A) of this memorandum, Harris' felonious conduct on January 6, 2021, was part of a massive riot that nearly succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Harris, fully aware that Congress was certifying the electoral college vote, breached the U.S. Capitol building within two minutes of the initial breach. He remained inside the building for over an hour and twenty minutes and, while inside, disrespected both the Capitol building and law enforcement. He pushed against Sgt. D. M. in the Crypt and yelled threats at him the OAP Hallway, and he physically assaulted Lt. M. H. in the Rotunda. The nature and circumstances of Harris' offenses were of the utmost seriousness, and fully support the government's recommended sentence of 70 months' incarceration.

29

### B.  The History and Characteristics of the Defendant

The defendant's past criminal history demonstrates his lack of respect for the rule of law and law enforcement and weighs in favor of a lengthy period of incarceration.

Sixteen days prior to January 6, 2021, and wearing the same blue camouflage "MAGA" hat that he wore on January 6, 2021, Harris participated in a separate riot at the Oregon State Capitol. On that date—December 21, 2020, the Oregon State Capitol was closed to the public, yet Harris, along with other protestors, violently pulled on the doors of the Oregon State Capitol, attempting to break into the building. Trial Tr. 108:17-22 (testimony of Oregon State Police Sergeant Elias Breen). Harris "was angry about being denied entry to the Capitol." Trial Tr. 106:12-13. Also, after witnessing journalists record the protestors' actions at the doors, Harris approached a journalist and shoved him twice. Trial Tr. 129:7-130:21; *see* Image 10, Government Trial Ex. 727. The assault was captured on video. In the video, Harris is heard saying, "Better fucking leave." *See* Government Trial Ex. 727.



**Image 10: Harris shoving journalist on Oregon State Capitol grounds; Government Trial Ex. 727 at 6 seconds**

Throughout the day on December 21, 2020, Harris demonstrated his disdain for law enforcement. He recorded videos of police vehicles sharing audio advising the rioters to leave Capitol grounds and that failing to do so may subject them to arrest for disorderly conduct. He further said of law enforcement, "People don't uphold their oath to the Constitution. They're breaking their oath for a paycheck." Government Trial Ex. 605. And, finally, in a selfie-style photograph, he held up his middle finger to a law enforcement officer dressed in riot gear and standing in front of armored vehicles.  *See* Image 11, Government Trial Ex. 627.



**Image 11: Harris holding up his middle finger to police officer; Government Trial Ex. 627**

Three days after participating in the riot at the Oregon State Capitol on December 21, 2020, Harris took a screenshot of a text exchange with a third party.  In the text exchange, Harris sent a third party an article with the headline, "Arrests made after protestors attempt to enter the Oregon Capitol[.]"  In the same text thread, Harris identified himself—alongside a "smiley-face" emoji—in a video that shows him assaulting a journalist who was present at the Oregon Capitol that day. *See* Government Trial Ex. 630; Government Trial Ex 727 (video of assault).

Harris was aware that others were arrested for conduct similar to his own on December 21, 2020. Yet even this knowledge did not dissuade Harris from, just 16 days later, traveling from Oregon to Washington, D.C. and actively participating in the January 6 Capitol riot.

Ultimately, for his conduct on December 21, 2020, Harris was charged with one count of Harassment for the assault on the journalist at the Oregon State Capitol. On March 14, 2022, Harris pleaded guilty to Harassment. PSR at 15.

The defendant's criminal history demonstrates a lack of respect toward the rule of law and law enforcement and a propensity towards violence that is concerning. The defendant's history and characteristics, including his prior criminal history, weigh heavily in favor of a lengthy term of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Harris' criminal conduct, attacking two police officers and corruptly obstructing of an official proceeding, is the epitome of disrespect for the law. When Harris entered the Capitol grounds, it was abundantly clear to him that the Capitol, and the police officers who tried to protect it, were under siege.

The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser

---

[8] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Harris has a criminal history category of I, his participation in back-to-back riots shows an escalating pattern of behavior. *See* Section VI(B). In two separate incidents, Harris has attempted to break into a Capitol building; he succeeded on January 6. During both riots, he ignored direction from law enforcement, intent on participating in the riot. And, in both of these instances, Harris used violence – attacking a journalist and law enforcement officers – in furtherance of his participation in the riot.

Second, even after hearing of the consequences of his actions from two of the victims of his crimes, Harris has shown no remorse for his actions on January 6. Lt. M. H. testified that, during Harris' assault, he was concerned for his safety, about being pulled into the crowd, and

---

[9] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

about losing his baton. Trial Tr. 64:14-65:10. Lt. M. H. testified, "If I get pulled into the crowd, then I have more problems. . . . If I lose the baton, to not get pulled into the crowd, then we've provided the other person with what can be used as a deadly weapon, and that could go down a whole other path. It – it can be problematic. . . . [I]f you're pulled into an angry crowd that doesn't like you, you're at least likely to get physically beaten, if not risk losing your firearm or other – other more deadly weapons to the crowd." Trial Tr. 64:14-25.

In addition, Sgt. D.M. testified that in the Crypt, during Harris' assault, he was concerned for his safety, putting his arms up in front of Harris to protect himself from an impending assault as Harris and the mob surged forward past the police line. Sgt. D. M. testified that during this push in the Crypt, "I found it difficult to breathe. I had no control over my extremities. I was unable to put protective covering over my firearm. I was completely at the mercy of this crowd and their surge and attempts to push past us." Trial Tr. 166:3-7; *see also* Trial Tr. 166:12-16, 213:12-19.

Yet, despite Harris hearing the two victims of his actions testify in Court, Harris has not demonstrated any remorse for his actions on January 6. In fact, Harris minimized his actions in the June 26, 2023, interview he gave just hours before he self-surrendered. During the interview, Harris stated that he "avoided fighting with the police" and that he was "not there to fight." And instead of displaying remorse for the victims of his actions, Harris indicated that "[a]fter seeing the witnesses the government brought," he thought the case against him "was weak." Harris further demonstrated his lack of remorse by expressing that at his sentencing, he will "have a lot to say" during his allocution and will not "bend the knee." He also called himself a "political prisoner" and, rather than recognizing the effects that the catastrophic events at the Capitol had on the police officers, Harris still believes he has "been screwed" and "[t]his is happening to me."

34

Finally, during the June 26, 2023 interview, Harris celebrated the events of January 6, stating that "[e]veryone who stood up . . . they were there for the right reasons," and that his "passion showed that day." Harris' conduct demonstrates a disturbing lack of remorse, disrespect for the rule of law and the role of law enforcement, and a willingness to engage in violence to further a desired outcome. His actions make clear that he presents a risk of repeating this conduct in the future if he faces a political outcome that he does not like or support. The government's recommended term of incarceration is necessary to specifically deter Harris from any such future crimes, to impress upon him the gravity of his crimes, and to promote respect for the law.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

35

### F.       Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every

sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[11]

Although all the other defendants discussed below—Southard-Rumsey, Salvador Sandoval, and Douglas Jensen participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences

---

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

### a. Audrey Southard-Rumsey, 21-cr-387-APM

Audrey Southard-Rumsey was charged in a 15-count indictment with violations of 18 U.S.C. §§ 1512(c)(2), 231(a)(3), and 111(a)(1), among other charges. Following a stipulated trial, Southard-Rumsey was found guilty of violating 18 U.S.C. § 1512(c)(2), three counts of 18 U.S.C. § 111(a)(1), and three counts of 18 U.S.C. § 231(a)(3). She was sentenced to 72 months' incarceration. Southard-Rumsey entered the U.S. Capitol building through the East Rotunda Doors at approximately 2:26 p.m., only a minute after the East Rotunda Doors were breached. While inside the Capitol, she displayed violent and disruptive behavior, consistently positioned herself on the front line of rioters, and engaged in multiple assaults against law enforcement. In fact, both Southard-Rumsey and Harris victimized the same officer, Lt. M. H., and in the same manner, by yanking on Lt. M. H.'s baton in the Rotunda. Southard-Rumsey exited the Capitol at 3:17 p.m. through the East Rotunda Doors. After the events of January 6, she has demonstrated a lack of remorse, stating, "I do not apologize for standing up for my country."

There are many similarities between Southard-Rumsey's actions and Harris' on January 6. Both defendants entered the Capitol within minutes of the initial breaches (Southard-Rumsey at the East Rotunda Doors and Harris at the Senate Wing Door), and both consistently found themselves on the front line of rioters, face-to-face with officers protecting the Capitol. Like Southard-Rumsey, Harris attacked more than one police officer who was securing the Capitol on January 6. In fact, both Southard-Rumsey and Harris victimized the same officer: Lt. M. H. In addition, like Southard-Rumsey, Harris has shown a lack of remorse for his actions on January 6.

Finally, while Southard Rumsey remained inside the building for a lengthy 51 minutes, Harris remained inside for even longer—1 hour and 22 minutes.

### b.  Salvador Sandoval, 21-cr-195-CKK

Salvador Sandoval was charged in 12-count indictment with violations of 18 U.S.C. §§ 1512(c)(2), 231(a)(3), and 111(a)(1), among other charges. He was found guilty of all charges after a bench trial and sentenced to 88 months' incarceration. Sandoval entered the U.S. Capitol building through the East Rotunda Doors at approximately 3:15 p.m. After entering, Sandoval grabbed the riot shield of an MPD officer, ultimately ripping it out of the officer's hands. After, he pushed another line of officers, nearly toppling an MPD officer, and attempted to forcibly remove a second riot shield from an officers' hands. After approximately 15 minutes inside the building, Sandoval was forced out by police officers at around 3:30 p.m. Sandoval expressed no remorse for his actions.

Like Sandoval, Harris attacked more than one police officer who was securing the Capitol on January 6. Harris attempted to rip away a riot baton but was ultimately unsuccessful in obtaining the baton, unlike Sandoval who was able to rip away the officer's riot shield. Similar to Sandoval, Harris has expressed no remorse after January 6. Finally, Harris was inside the Capitol building for 1 hour and 22 minutes, a much longer period of time than Sandoval's 15 minutes in the building. And Harris' assaults were more separated in time. After each interaction with a line of law enforcement officers, Harris had the opportunity to consider his behavior and leave the Capitol. Instead, Harris progressed into the building, leaving only when pushed out by officers.

### c.   Douglas Jensen, 21-cr-6-TJK

Douglas Jensen was charged in 7-count indictment with violations of 18 U.S.C. §§ 1512(c)(2), 231(a)(3), and 111(a)(1), among other charges. He was found guilty of all charges after a jury trial and sentenced to 60 months' incarceration. Jensen was one of the first ten rioters inside the building on January 6. Once inside, he found a lone USCP officer facing an angry mob. Instead of backing up, as the officer directed, Jensen engaged in a menacing pursuit of the officer, up a flight of stairs to the second story of the Capitol building. Jensen left after he was escorted out of the building; however, undeterred, Jensen found a second entrance to the building near the East Rotunda doors and breached the Capitol a second time. While inside, Jensen physically shoved multiple police officers. Jensen only left the building after the second breach because he was physically escorted out of the building. After seeing himself on the news after the events at the Capitol, Jensen turned himself into the FBI. In so doing, he said his actions "would have been worth it" if he had achieved his desired outcome, to ensure President Trump stayed in power.

The facts of Harris' case are similar to Jensen's in certain aspects. Harris breached the Capitol building within two minutes of the initial breach but was not one of the first dozen to enter. Jensen breached the building twice, while Harris remained inside the building during an extensive 1 hour and 22 minutes. Also, Jensen directly impeded a USCP officer, following him up a flight of stairs and ignoring his commands. Similarly, Harris impeded Sgt. D. M. and followed him from the Crypt to the OAP Hallway, where he shouted threats, such as, "Stand down. You're outnumbered. There's a fucking million of us out there. And we are listening to Trump – your boss." Harris also engaged in a physical assault of a police officer, Lt. M. H. Finally, both Jensen

and Harris engaged in multiple interactions with law enforcement officers and expressed no remorse for their actions on January 6.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But, since Harris was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use

the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[12]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses").

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

*See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Harris to pay $2,000 in restitution for his convictions on Counts One through Five. This amount fairly reflects Harris' role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 70 months of incarceration, three years of supervised release, restitution in the amount of $2,000, and a special assessment of $605.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    _/s/ Laura Hill_____
LAURA E. HILL
Trial Attorney, Detailee

JULIE BESSLER
Assistant United States Attorney

</div>